## STOIA *v.* MISKINIS.

1. INJUNCTION—RESTRICTIVE COVENANT AS TO REENGAGEMENT IN BUSINESS—EVIDENCE.

> Continuance of interest of former partners in new theater project started in violation of covenant not to engage in theater business within a certain area for period of five years after sale of interest in two theaters to plaintiffs now seeking specific performance thereof by injunction *held*, not proved by fact that one of such partners was repaid $46,250 of $50,000 he had originally invested a few weeks before, where partners had executed releases one to the other and no promise to repay balance was made to withdrawing partner, the son of covenantors from whom land for new theater project had been purchased, nor by fact that former partner who withdrew from new project made contracts with partners remaining interested for construction of other theaters out of the restricted area (3 Comp. Laws 1929, §§ 16667, 16672).

2. COVENANTS—RESTRAINT OF TRADE—PERSONAL COVENANTS OF COVENANTORS.

> A covenant on the part of withdrawing members of close corporation operating two theaters not to reengage in theater business within four miles of such theaters for a period of five years, intended to be completely restrictive as to the covenantors, did not attach to land owned by the covenantors within the restricted area so as to prevent them from selling it for use by others in the theater business nor prevent successors from selling it for use in same business (3 Comp. Laws 1929, §§ 16667, 16672).

3. CONTRACTS—INJUNCTION—PARTIES—SALE OF LAND—RESTRAINT OF TRADE.

> In suit to enforce covenant not to engage in theater business for five years within four miles of theaters sold plaintiffs, restriction imposed by injunction upon appellants not parties to covenant preventing them from selling lots within such area for use for such purpose would not be justified (3 Comp. Laws 1929, §§ 16667, 16672).

Contracts in restraint of trade generally, see 2 Restatement, Contracts, §§ 513–516, inclusive.

4. Same—Restraint of Trade.

Any bargain or contract which purports to limit in any way the right of either party to work or to do business, whether as to the character of the work or business, its place, the manner in which it shall be done, or the price which shall be demanded for it, may be called a bargain or contract in restraint of trade (3 Comp. Laws 1929, §§ 16667, 16672).

5. Same—Restraint of Trade—Public Policy.

Generally courts are reluctant to enforce contracts in restraint of trade as being against the policy of the public in encouraging business competition (3 Comp. Laws 1929, §§ 16667, 16672).

6. Same—Restraint of Trade—Reasonableness.

In order to be valid, a promise imposing a restraint in trade or occupation must be reasonable (3 Comp. Laws 1929, §§ 16667, 16672).

7. Same—Construction—Restraint of Trade.

Courts strictly interpret bargains or contracts restricting competition and are inclined to find that the particular act complained of does not constitute a breach of the restrictive agreement (3 Comp. Laws 1929, §§ 16667, 16672).

8. Injunction—Contract in Restraint of Trade—Theaters—Parties.

In suit to enforce covenant to plaintiffs upon purchase of covenantors' interest in two theaters whereby covenantors agreed not to engage in theater business within four miles for a period of five years, injunctive relief cannot be granted plaintiffs against defendants, not parties to the covenant, where financial interest between such defendants and covenantors in new theater enterprise in restricted area has been eliminated since injunction proceedings were commenced but injunction is continued until termination of any relation between such defendants as to lots owned by covenantors leased to appellants for parking cars of patrons of new theater.

9. Costs—Injunction.

No costs are awarded in suit to enjoin operation of theater within an area restricted by covenants of certain defendants not to engage in such business where circumstances require continuance of injunction until complete severance of relations of covenantors and other defendants relative to lots owned by former under lease to other defendants for use for parking cars of patrons of new theater.

Appeal from Wayne; Miller (Guy A.), J. Submitted April 15, 1941. (Docket No. 1, Calendar No. 41,544.) Decided June 2, 1941.

Bill by Joseph Stoia and wife against Joseph Miskinis and others to restrain the construction and operation of a theater. Victor Retty, Joseph Johann, and Katherine Johann added as parties plaintiff. Philip Gorelick, Greater Detroit Theatres, Inc., and Regal Construction Company, Michigan corporations, Ben J. Marshall, Fanny Marshall, and Oscar A. Gorelick added as parties defendant. Decree for plaintiffs. Defendants Gorelick, Marshall, Greater Detroit Theatres, Inc., and Regal Construction Company appeal. Reversed and remanded.

*Louis J. Colombo* and *Anthony A. Vermeulen,* for plaintiffs.

*Beckenstein & Beckenstein* and *Paul J. Wieselberg* (*Louis H. Fead,* of counsel), for defendants.

BOYLES, J. This case is a bill in chancery for specific performance of a covenant by the vendors in a buy-and-sell agreement not to compete against the vendees therein by "owning, operating or managing theaters" for a certain period and within a certain area. The suit was started July 1, 1940, by Joseph and Victoria Stoia against Joseph and Mary Miskinis, their son Joseph, Jr., and Philip Gorelick. Since that time other parties plaintiff and defendant have been added, as will appear later. Complexity of the facts in the case makes an extended statement necessary.

Joseph and Victoria Stoia and Joseph and Mary Miskinis were associates (by means of a close cor-

poration) in owning and operating the Midway and Circle theaters in Detroit. They were quite successful in these ventures. In August, 1939, certain differences having arisen, the Stoias filed a bill in equity for a dissolution and accounting. When the case came on to be heard before Circuit Judge Guy A. Miller, the parties agreed that they would resolve their differences by having a sale of the assets, each party to bid therefor. Judge Miller, in the presence of all the parties and their attorneys, dictated a buy-and-sell agreement which was signed in open court by the parties, and which provided in substance that the parties were to submit alternate bids for the two theater properties and the one who ultimately submitted the highest bid should become the owner. This agreement contained the following covenant:

"The vendors at said sale agree that they will neither directly nor indirectly in any manner whatsoever enter into the business of owning, operating or managing theaters for the term of five years after said date, within a circuit of four miles from the location of either of said theater properties. This agreement shall be construed as broadly as possible to cover every connection of any sort whatsoever with any form of theater enterprise within said territory during said period."

On February 16, 1940, the same day the agreement was signed, the parties went into court and the sale was held as agreed, in open court. The Stoias became the owners of the properties by reason of submitting the highest bid. The restrictive covenant thereby became effective against the Miskinises as vendors.

In December, 1939, and January, 1940, Mrs. Miskinis had purchased 10 contiguous lots within

the area now covered by the restriction, for $8,000, the deeds being taken in her maiden name. On the last day of February two more nearby lots were purchased by her in the name of Margaret Forest for $1,200, and during the spring of 1940 other nearby lots in the same restricted area were bought by the Miskinises. The purpose in using the maiden name of Mrs. Miskinis and the name "Margaret Forest," and the delay in recording the deeds, was claimed to be to avoid a rise in prices against the purchase of other adjacent lots. The purpose of the Miskinises in buying these lots was to put their only son, Joseph Miskinis, Jr., into the theater business. Joseph, Jr., was then a 23-year-old student about to graduate from college. In March, 1940, Joseph Miskinis, Jr., prepared a sketch of a theater and in April he submitted it to an architect to prepare plans. On April 6th a contract was entered into between Joseph, Jr., and the architect to prepare plans, calling for payment of $1,100. The obligations of Joseph, Jr., under this contract were paid by him from money given to him by his parents. On April 13th, $500 was given to him, and, on May 23d, $300 more was given. On June 22, 1940, $49,200 was given to Joseph, Jr., by his parents, making the total gift $50,000. This money was intended for construction of a theater to set Joseph, Jr., up in business.

Philip Gorelick had been known to both Stoia and Miskinis since 1928, at which time he had built a theater for them. In January of 1940, he had tried to interest Miskinis in a certain theater site. Miskinis, Sr., in May, 1940, told Gorelick about Joseph, Jr., having an architect prepare plans for a theater and asked him to submit an estimate of the construction cost. The plans were completed in June, 1940, and Gorelick then made a bid of

$150,000 for constructing the theater. This price, together with the fact that the Miskinises were contemplating a $170,000 theater venture of their own, made it necessary to secure financial aid for Joseph, Jr., and Gorelick was accordingly invited to become a partner in the new theater venture. It was to be known as the Carmen theater and was to be erected on some of the vacant lots owned by Mrs. Miskinis within the area restricted by the covenant.

On June 24, 1940, a partnership agreement was entered into by Gorelick and Joseph Miskinis, Jr., whereby, among other provisions, it was agreed:

(1)    Joseph, Jr., was to contribute $50,000; Gorelick was to contribute 12 lots—secured from Mrs. Miskinis in a trade—worth $9,200, and his time, effort, and experience in the operation of a theater;

(2)    The partnership was to contract with Gorelick as the builder for the construction of the theater—the profit from which was to belong solely to Gorelick;

(3)    The parties were to have equal interests;

(4)    Gorelick was to arrange for a mortgage, or finance the balance personally.

A construction contract was entered into between the partnership and Gorelick individually, executed on the same day, which provided that the cost was to be $147,000. Joseph, Jr., deposited $50,000 in a partnership account in the names of Philip Gorelick and Joseph Miskinis, Jr. Philip Gorelick secured the 12 lots from Mrs. Miskinis by trading other real estate for them and then deeded the 12 lots to the partnership.

On June 26th, Mrs. Miskinis' deeds as grantee of the lots comprising the new Carmen theater site, together with her deed to Philip Gorelick and the deed from him and his wife to the partnership, were recorded. A sign was erected near the premises

advising the public of the construction by Gorelick and Miskinis, Jr., of a theater thereon; and on June 28th excavation was begun. The next day (June 29th), Stoia discovered it and was informed by Gorelick that he was building a theater. Gorelick until then had no knowledge of the covenant between the Miskinises and the Stoias restricting the Miskinises from being interested in a theater at this location.

On July 1st, the bill was filed by the Stoias against the elder Miskinises, Joseph Miskinis, Jr., and Gorelick, and an *ex parte* injunction secured restraining the construction. Answers of the then defendants were filed, together with a motion to dissolve the injunction, which was denied.

Gorelick, being desirous of continuing with the construction, then sought financial aid from others. He induced Ben J. Marshall (now a defendant) to invest $25,000. This will be referred to later.

On July 19th, Joseph Miskinis, Jr., decided to drop out of the venture. On July 26, 1940, a dissolution agreement was entered into between Gorelick and Joseph, Jr., whereby the lots were reconveyed by the partnership to Gorelick, who also got the plans, excavation and other assets, the bank balance of $46,250 was given back to Joseph, Jr., and mutual releases were given. Joseph, Jr., has since retained this money, losing $3,750 in the venture. Plaintiffs claim the Miskinises still have an interest in the venture by reason of Joseph, Jr.'s failure to recover his entire investment. Plaintiffs ignore the fact that mutual releases of all liability were exchanged by Gorelick and Joseph, Jr., in the dissolution. Joseph, Jr.'s failure to recover the $3,750 from the venture falls short of proving that the Miskinises still have an interest in the property or business of the Carmen theater. There is no

evidence of any promise to repay this money to Joseph, Jr., or of his retaining an interest in the project by reason of it. On this phase of the case, the evidence shows that Joseph, Jr., sacrificed this amount in withdrawing from the enterprise. Equity surely does not require that the court must order reimbursement to Joseph, Jr., or his parents—or find that they still have an interest in the venture on that account.

On July 31st, Joseph, Jr., withdrew the money from the partnership account, to be used on another theater job with his father. This job was to be known as the Carthay theater. The Carthay construction contract was given to Gorelick by the Miskinises on August 30, 1940, at a figure of $170,000. A construction contract for another theater (the Civic) was also given to Gorelick by the Miskinises on September 18, 1940, at a figure of $86,000. Plaintiffs claim these contracts make it possible for Miskinis to put money into the Carmen theater within the restricted area with Gorelick acting as a conduit. They claim that $15,000 was advanced by Miskinis on the Carthay job and $14,000 on the Civic, or a total of $29,000, not justified by the amount of work completed upon these two theaters. However, Gorelick's undisputed testimony is that some $45,000 had been put into these two jobs.

A deal was consummated July 29th between Gorelick and Ben J. Marshall for new capital, the agreement providing that a corporation with a capitalization of $50,000 be formed, that Gorelick and Marshall were each to have a one-half interest, that Marshall should put in $25,000 cash, Gorelick to put in $11,800 in land, plans, excavation, and cash and was to pay the balance of the $25,000 from time to time and get stock as he did so. The land, plans and excavation were the Carmen project.

In keeping with this arrangement, Greater Detroit Theatres, Inc., was organized, this corporation to own, operate and manage the Carmen and other theaters in Detroit. Shares were issued to Fanny Marshall, Ben J. Marshall, Philip Gorelick and Oscar A. Gorelick. At the same time, the Regal Construction Company, Inc., with a capitalization of $1,000, was organized. Shares were issued to Ben J. Marshall, Philip Gorelick and Oscar A. Gorelick. These corporations and shareholders were subsequently joined as defendants, as will appear later. July 30, 1940, a construction contract was executed by these corporations under which the Regal Construction Company, Inc., was to erect the Carmen theater for Greater Detroit Theatres, Inc. On August 12th the Greater Detroit Theatres, Inc., leased from Mrs. Miskinis seven other lots near the Carmen construction, and on September 25th a purchase option on these lots at $11,500 was obtained from her by the corporation. These lots were to be used for parking purposes.

Claiming that the project was now definitely separated from the Miskinises' negative covenant, Gorelick obtained leave from the court to file a supplemental answer and petition to dismiss the cause. Dissolution of the Gorelick-Miskinis partnership, the withdrawal of the latter from the Carmen project, and the creation of the two corporations by the Gorelicks and Marshalls were all set up as the reason why the injunction issue had become a moot question as to the Miskinises and Gorelick. At this stage of the proceedings, they were the only defendants in the case. The two corporations and their shareholders had not been added. At that time, no application had been made to have the new corporations, or the Marshalls, or Oscar Gorelick, brought in as parties or to have the injunction extended to them.

On August 21st, Joseph Stoia petitioned for an order to require the Miskinises (senior and junior), the two corporations, the Marshalls, and Oscar and Philip Gorelick to show cause why they, and each of them, should not be cited for contempt in violating the injunction of July 1, 1940. The order was denied on the ground that the corporations and the other additional persons named were not defendants and, therefore, not before the court. Later on, however (on August 28th), the two corporations and their shareholders, the Marshalls, and Oscar Gorelick were joined as defendants by leave of court.

On October 16th an amended bill of complaint was filed against the former as well as newly-joined defendants setting forth, in substance that the new corporations were but new devices to conceal the true ownership of the Carmen theater, and that the conveyance to them was a breach of the Miskinis covenant. It sought to enjoin all the defendants from continuing the work on the theater and from entering into the business of owning, operating or managing theaters within the restricted area or "from having any connection of any sort whatsoever with any form of theater enterprise within said territory" during the prescribed period of time. The matter thus came on for hearing on the merits, and the circuit judge who heard the case concluded that:

"All of the transactions in connection with the construction of this theater, which included the gift to Miskinis, Jr., the organization of the partnership between Gorelick and him, and the construction contract between the partnership and Gorelick, are obviously a violation of the terms of the negative covenant. * * *

"The difficulty in the case lies in determining from the evidence whether Miskinis, Senior's retirement from the Carmen theater project is real or only apparent, and whether the entry of Marshall and the continuation of the construction project by him and Gorelick is a completely good-faith transaction on the part of the latter.

"If the retirement of Miskinis is real, and if Gorelick and the Marshalls are the only ones beneficially interested at the present time, then the plaintiffs are not entitled to relief as against any of the defendants except the Miskinises. If, however, the latter have an undercover interest, based upon agreement with Gorelick and the Marshalls, then plaintiffs are entitled to injunctive relief as against all defendants.

"The case is practically one which rests upon conduct which is claimed by the plaintiffs to be essentially fraudulent. The decision as to whether or not the Miskinises, Gorelick and the Marshalls are all parties to a fraudulent conspiracy to violate the terms of the covenant in question must turn in this case upon whether such fraud may be inferred from facts and circumstances.

"There is no direct testimony which establishes a cause of action as against Gorelick and the Marshalls to the point of demonstration. There are, however, strong elements which establish the bad faith of the Miskinises, and also establish knowledge on the part of Gorelick and the Marshalls when they entered into the deal that the Miskinises had acted in bad faith. As a matter of fact the only issue in the case relates to Gorelick and the Marshalls and the two corporations. It is conceded that the plaintiffs are entitled to injunctive relief as against the Miskinises."

After discussing the probabilities arising from the connection of Gorelick with the entire venture, the court reasoned that the $3,750 left (or lost) by

Joseph, Jr., in the venture, plus the lease and option of the vacant lots by Mrs. Miskinis to Greater Detroit Theatres, Inc., for parking, indicated that the Miskinises still had a substantial interest in the venture and that all of the defendants were fraudulently conspiring to violate the restriction.

The Miskinises (senior and junior) have not appealed from the decree. The Gorelicks, the Marshalls, and the two corporations are appealing. The injunction from which they appeal restrains Philip Gorelick, Greater Detroit Theatres, Inc., Regal Construction Company, Inc., Ben J. Marshall, Fanny Marshall, and Oscar Gorelick from operating the theater, *from selling it* or transferring possession, ownership or control so as to permit anyone else to operate it, during the prescribed period of time.

Plaintiffs must necessarily rely on the claim that in some way Gorelick and the other appellants are agents, partners or the *alter egos* of the Miskinises in violating the restrictive covenant, and that the Miskinises are still connected with the ownership, management and operation of the enterprise; as to these appellants, the decision must turn upon whether they have engaged in some sort of a conspiracy to violate the terms of the restrictive covenant. They are not parties to the covenant; therefore, their knowledge of the same and guilty intent to violate it must be proven or necessarily inferred from the facts.

The Michigan statute law on the subject matter is as follows:

"All agreements and contracts by which any person, copartnership or corporation promises or agrees not to engage in any avocation, employment, pursuit, trade, profession or business, whether

reasonable or unreasonable, partial or general, limited or unlimited, are hereby declared to be against public policy and illegal and void.'' 3 Comp. Laws 1929, § 16667 (Stat. Ann. § 28.61).

''This act shall not apply to any contract mentioned in this act, nor in restraint of trade where the only object of restraint imposed by the contract is to protect the vendee, or transferee, of a trade pursuit, avocation, profession or business, or the good will thereof, sold and transferred for a valuable consideration in good faith, and without any intent to create, build up, establish or maintain a monopoly.'' 3 Comp. Laws 1929, § 16672, as amended by Act No. 202, Pub. Acts 1935 (Comp. Laws Supp. 1940, § 16672, Stat. Ann. § 28.66).

As between the covenantors themselves, this exception has been frequently considered and upheld by this court. *Weickgenant* v. *Eccles*, 173 Mich. 695; *Bottomley* v. *Brown*, 188 Mich. 134; *Wolverine Sign Works* v. *Powers*, 248 Mich. 371; *Colton* v. *Duvall*, 254 Mich. 346.

In the case at bar, the negative covenant in question is a personal one, intended to be completely restrictive as to the covenantors who signed. It cannot be successfully claimed that it attaches to the land of the covenantors, to prevent them from selling the lots. Neither is the restriction imposed by the injunction on these appellants (who are not parties to the covenant) preventing *them* from selling the property justified by law. See *Sloan* v. *Charlevoix State Savings Bank*, 260 Mich. 291.

''Any bargain or contract which purports to limit in any way the right of either party to work or to do business, whether as to the character of the work or business, its place, the manner in which it shall be done, or the price which shall be demanded for it, may be called a bargain or contract in restraint of

trade." 5 Williston on Contracts (Rev. Ed.), p. 4576, § 1633.

As a general rule, courts are reluctant to enforce such contracts as being against the policy of the public in encouraging business competition.

"It is everywhere agreed that in order to be valid a promise imposing a restraint in trade or occupation must be reasonable. * * *

"The courts strictly interpret bargains or contracts restricting competition and are inclined to find that the particular act complained of does not constitute a breach of the restrictive agreement." 5 Williston on Contracts (Rev. Ed.), pp. 4580, 4583, § 1636.

The case of *Arctic Dairy Co.* v. *Winans,* 267 Mich. 80 (94 A. L. R. 334), differs materially from the case at bar. In that case, the covenantors themselves had organized a corporation using their family name, and in which they held a controlling interest. The use of the name "Winans" was a major factor in controlling the decision. In the case at bar, the covenantors (the Miskinises) did not organize or participate in the defendant corporations. The question is not before us (as in the *Winans Case*) as to the result if appellants themselves had signed the restrictive covenant.

An injunction against the two corporations, the Marshalls, and the Gorelicks can be predicated only on a present Miskinis interest. *Jefferson Reeves & Co.* v. *Sprague* (1894), 114 N. C. 647 (19 S. E. 707); *Kramer* v. *Old* (1896), 119 N. C. 1 (25 S. E. 813, 34 L. R. A. 389, 56 Am. St. Rep. 650); *Sineath* v. *Katzis* (1941), 218 N. C. 740 (12 S. E. [2d] 671).

In the *Reeves Case, supra,* a druggist named Sprague sold his business and part of his stock to the plaintiffs and covenanted not to enter into the

drug business in the town for three years. He then sold the remainder of his stock to the defendant Davis and took a purchase-money mortgage to secure payment. The plaintiffs claimed that the sale and mortgage were shams and sought to enjoin Davis from engaging in the drug business. The court said:

"We find in the evidence adduced no substantial foundation for the plaintiffs' allegation that the mortgage made by Davis to Sprague is a sham, and that Davis is merely the agent of Sprague. If, in fact, he is such agent the injunction against the defendant Sprague and *his* agents is sufficient for the plaintiffs' purposes. They produce no proof whatever, as it appears to us, that the appellant is Sprague's agent—only facts that might raise a suspicion that he is. To stop his lawful business upon the evidence now before us seems unreasonable."

In the *Kramer Case,* it was held that where vendors of mill property, who agreed not to continue a similar business in the same place thereafter, with others formed a corporation to engage in the same business at the same place, neither the corporation nor those interested in it, *other than the vendors,* could be enjoined from carrying on such business.

In the case of *Harkinson's Appeal,* 78 Pa. 196 (21 Am. Rep. 9), injunctive relief was denied under circumstances far more impelling than in the case at bar. A mother sold her place of business and agreed not to engage in the same business in the same locality. Later she bought a lot, put up buildings suitable for business, and advanced money to her son for carrying on business there. The court found that the business was solely that of the son and that the agreement in restraint of trade was

not binding upon him. Under the holding in that case, Joseph Miskinis, Jr., could not have been enjoined in the case at bar.

In *Western Wooden-Ware Ass'n* v. *Starkey,* 84 Mich. 76 (11 L. R. A. 503, 22 Am. St. Rep. 686), the vendors in selling their stock and material agreed not to engage in the business for five years within a certain area, nor to allow their premises to be used for that purpose, nor to sell them for such use. This restriction on sale or use was held void on the ground of public policy. This court said:

"In the present case, the defendants Starkey, Ferris, and Olmsted were not only to remain out of such business for the full time specified, but the premises which had been used to carry on the manufacturing by them, though not sold and conveyed under the contract, could not be again used for such time by them or any other party for the same business. I do not think it needs the citation of authorities to show that contracts of this nature have frequently been condemned by the courts, and held void as unreasonable restraints of trade, and therefore void on the ground of public policy."

Both Philip Gorelick and plaintiff Joseph Stoia testified that Gorelick did not know of the contract containing the negative covenant until June 29th, after Gorelick had begun excavation for the Carmen theater. Gorelick had already acquired title to the land. He had the right to sell it to the partnership. *Hubbard* v. *Miller,* 27 Mich. 15 (15 Am. Rep. 153); *Vogue Cleaners & Dyers, Inc.,* v. *Berkowitz,* 292 Mich. 575. We are convinced that, with one possible exception, the Miskinises have no interest in the present venture of the Carmen theater project. Conjectures and inferences to the contrary do not rise to the dignity of proof by a fair preponderance of the evidence. The court below conceded that there

was no "direct" evidence of any such interest. Joseph, Jr., had no such interest merely because he had sacrificed $3,750 in withdrawing from the venture.  The possible exception which we note lies in the fact that Mrs. Miskinis owns some vacant lots adjoining the theater which have been leased to Greater Detroit Theatres, Inc., for parking use by patrons of the theater.  We recognize that available parking privileges may be a valuable adjunct to the theater business.  While it is doubtful if this can be considered as retaining an interest in the project, we are mindful of the exceedingly broad language of the covenant.  The Miskinises agreed that they would "neither directly nor indirectly in any manner whatsoever" enter into the business; and the restriction was to be construed "as broadly as possible to cover every connection of any sort whatsoever with any form of theater enterprise." Under the circumstances of this case and in view of the connection of Philip Gorelick, nothing should be left undone to complete the course of action pursued by appellants toward eliminating the Miskinis connection since the injunction was originally granted.

The theater building has been completed and is ready for use.  The record is not convincing that appellants should be permanently enjoined from operating or using the theater or selling the property.  Equity does not require that appellants be restrained from exercising the option to purchase the parking lots from Mrs. Miskinis.  The option price is not out of proportion to the actual value, and by so doing the connection between the Miskinises and appellants may be eliminated.  We have considered all the circumstances and inferences from which a conclusion might be drawn that appellants are guilty of conspiring with the Miskinises

to violate their covenant. The ground for suspicion goes short of proving the case. During the progress of the litigation, defendants have reasonably attempted to sever the Miskinis connection. Except for the parking lots, plaintiffs fail to show the present existence of any Miskinis financial interest in the enterprise.

The injunction against Joseph Miskinis, Mary Miskinis, and Joseph Miskinis, Jr., will stand, not having been appealed from. The case is remanded for entry of a decree modifying the injunction as to appellants. The decree may provide that appellants be enjoined from operating or managing the Carmen theater unless and until the arrangement be terminated whereby the parking lots owned by Mrs. Miskinis were leased or optioned to the Greater Detroit Theatres, Inc. The circuit court may retain jurisdiction for that purpose. When that is done, the court shall enter a decree dismissing the injunction as to these appellants. Under the circumstances, no costs are awarded.

SHARPE, C. J., and BUSHNELL, CHANDLER, NORTH, WIEST, and BUTZEL, JJ., concurred. McALLISTER, J., took no part in this decision.