## BROWN v. A. F. BARTLETT & CO.

1. CONTRACTS—CONSTRUCTION—"PROFITS"—PAROL EVIDENCE.
   That the surrounding circumstances and the connection in which the term "profits" is used in an instrument may present such uncertainty as to render parol evidence admissible for the purpose of ascertaining the sense in which it is used, has been recognized.[1]

2. SAME.
   Neither does a well-recognized technical meaning of a term necessarily preclude oral evidence of an intended or understood modified meaning, where the circumstances and

[1]See note in 4 L. R. A. (N. S.) 980.

language in connection with which it is used tend to obscure it and leave in doubt the light in which the parties to the agreement regarded it.

3. SAME—CONSTRUCTION AGAINST PARTY PREPARING CONTRACT.
Where the written agreement sued upon was prepared by defendant's president, its doubtful or incomplete provisions are not to be construed to defendant's advantage.

4. SAME—CONSTRUCTION—PAROL EVIDENCE.
In an action by a salesman for commissions claimed to have been earned in pursuance to the terms of a written contract of employment which provided for the payment of a commission to plaintiff on all orders procured by him and sold at a profit to defendant, and which further provided that plaintiff should carry out the instructions communicated to him from time to time, oral testimony of plaintiff that defendant's president instructed him that cost would be made by adding 20 per cent. for overhead to actual cost of labor and material was admissible, since the written instrument was incomplete and did not express the entire agreement or understanding of the parties.

5. SAME.
The contention by defendant that costs of which plaintiff could have no knowledge and which could only be ascertained at the end of the year should be included in determining whether defendant had made a profit was inconsistent with the terms of the contract, which provided for the payment to plaintiff of the commission 30 days after an order sold at a profit had been paid for.

6. SAME—"PROFITS"—CONSTRUCTION.
Where an employee is to have a per cent. of the net profits when realized on certain contracts, only necessary expenses or disbursements on account of such contracts are to be deducted, and not all the expenses incidental to the management of the employer's business.

7. SAME—"PROFITS"—CONSTRUCTION—PAROL EVIDENCE.
Held, that the written contract in question did not so plainly express the full and final intention of the parties upon the question of "profits" as to preclude resort to oral testimony to determine its meaning.

Error to Bay; Houghton, J. Submitted October 19, 1917. (Docket No. 57.) Decided June 3, 1918.

Assumpsit by Edward W. Brown against A. F. Bartlett & Company on a contract of employment. Judgment for plaintiff. Defendant brings error. Affirmed.

*John F. O'Keefe,* for appellant.

*Stoddard & McMillan,* for appellee.

STEERE, J. Defendant is a corporation, located in Saginaw, Michigan, where it is engaged in the manufacture of certain kinds of machinery, operating a plant consisting of a foundry, boiler shop, machine, pattern and blacksmith shops with requisite equipment. It also as a part of its business does repair work of certain kinds and so-called "original jobs" in manufacturing and installing, complete with equipment at an agreed price, such machines or appliances as it manufactures and deals in.

Plaintiff, who was experienced in that line of work and had previously "sold machinery on the road" for others engaged in similar business, entered defendant's employ on February 8, 1915, under the following contract:

"SAGINAW, MICHIGAN, January 26, 1915.
"MR. E. W. BROWN,
  "Bay City, Michigan.
  "*Dear Sir:* A. F. Bartlett & Co. of Saginaw, Michigan, is willing to employ you as a traveling salesman and pay you for your services a salary at the rate of $1,500 per year, together with the amount of your legitimate traveling expenses necessarily incurred in developing business for the company, salary to be paid semi-monthly.

"In addition to the above we will pay you a commission of five per cent of the receipts of the company on all orders procured by you for machinery, provided such orders are executed and sold at a profit for the company, such commission also to apply on all orders received by us from new customers within twelve months from the date of the first order; no commission to be paid you on orders taken and filled by the

company without profit. This provision, however, not to apply to regular business taken in the cities of Saginaw and Bay City, Michigan. No commissions are to be due or paid you until thirty days after full payments on orders have been received by the company.

"It is understood that you will devote your entire time and attention to the company's interests, work in harmony with its management, and carry out such instructions in connection with the development of the company's business as it may communicate to you from time to time.

"The above arrangement will continue in full force and effect for a period of one year and thereafter either party hereto may terminate this arrangement by giving the other party thirty days' notice of his desire to do so.

"If the above proposition is acceptable to you, kindly note your acceptance on the line indicated below.

                    "A. F. BARTLETT & CO.,
                    "By A. M. LEMKE, President.

"I hereby accept the above proposition this 27th day of January, A. D. 1915.

                              "E. W. BROWN."

Plaintiff remained with defendant about 13 months, leaving because his services were not satisfactory, as its president claimed, who testified of the occasion for his quitting in part as follows:

"I told him we couldn't afford to keep him; that he was not earning us any money, and he resigned, gave us thirty days' notice according to his contract."

In May, 1916, plaintiff commenced this action against defendant in the circuit court of Bay county, claiming in his declaration that there was yet due him from defendant under his contract of hiring $28.84 unpaid salary and $1,057.12 for commissions earned.

Defendant pleaded the general issue with a lengthy notice of recoupment for damages resulting from losses sustained in filling orders taken by plaintiff contrary to instructions, for wages paid him covering time in which he falsely claimed to be working for de-

fendant put was idle, and for $68.53 expense money furnished him but not used for that purpose nor accounted for.

As to plaintiff's salary of $1,500 per year and necessary traveling expenses provided for in the contract there is little dispute. Defendant showed by its testimony that it had paid him $125 per month until he left, amounting to $1,668.20, and furnished him on expense account $791.99, for $68.53 of which he had not accounted. He admitted upon the trial that this item was a proper charge against him, but claimed a credit for one week more time than was paid him, amounting to $28.84, in addition to unpaid commissions earned, the balance computed from his testimony and claimed due him on his theory at the close of the evidence, as stated by the court, being $682. A verdict was returned by the jury in his favor for $400 and judgment was rendered thereon.

The contested issues upon the trial were how profits should be computed under the facts shown and terms of the contract and when properly computed, what, if any, orders procured by plaintiff entitled him to a commission which he had not been paid.

Of plaintiff's instructions and the nature of his services Mr. Lemke, the president of the company, testified:

"I told him he would be traveling salesman, furnished with prices from time to time, as they varied, and he would be told what to charge. * * * Well, when we heard of a plant being built we sent him up there to see what machinery they wanted, and instructed him to sell the machinery, and he was provided with price list, cost and discounts every time he went out on a trip; if there was any changes he would go to the place to figure up what the man wanted, make a list of it, use his discount sheet, price of the material, make up his cost and add his profit.

"Q. Who made these figures on these several jobs?

"A. Well, he made all his figures with the exception of appertaining to the structural steel."

This was subsequently further explained, or modified, as follows:

"Mr. Brown was furnished with these catalogues to use in his solicitation and also with discount sheets, showing what discounts he could from time to time allow off from the prices. He was required to use these catalogues and discount sheets in getting his cost. * * * When there was a special order upon which something had to be made different from the, regular line, or the articles which we were listing in our catalogues, as a rule drawings were made first, from which estimates were made; from these drawings the estimates by the different men in the different departments, depending upon where the work was going to be done. These estimates showed what the cost would probably be, as near as could be determined, in the respective departments, and were given to Mr. Brown to aid him in fixing his prices; he was supposed to use them to make the prices high enough to cover the estimate at a profit."

Of this plaintiff testified:

"Mr. Lemke and Mr. Stevenson fixed the price at which I could sell or take an order from a customer. Mr. Stevenson was the foreman of the boiler shop. The general process of taking an order was that I made out a specification of what the customer wanted. I generally did that; then took the discount sheet which Mr. Lemke had seen was given me, changed from time to time, took the discount off from the price list and submitted it to my customer, sometimes handing that to Mr. Lemke to get his O-K on it, and if there was any work that came to the boiler shop it was given over to Mr. Stevenson, the plans, Mr. Stevenson made me a price on it for me to submit. It was the instructions of Mr. Lemke that I was not to make anything on the structural steel end of it. These instructions were given me by Mr. Lemke at the time the contract was made. Upon making those specifications out I submitted them to my customer. After submitting them to my customer I did not always submit them to any one in connection with the defendant, sometimes I did."

Against defendant's objection that the proposed testimony, which had been previously debated, was incompetent "for the reason that it is an attempt to modify the terms of this contract," the following testimony of plaintiff was introduced:

"*Q.* Now, will you state what, if anything, was said by Mr. Lemke at the time the contract was made concerning what you were to take into consideration as determining the cost of the articles for which you were to take orders?

"*A.* There was, before signing the contract, I asked Mr. Lemke to define how the costs were going to be made. He said, at actual cost of labor and adding twenty per cent. for overhead. And then I went back into his private room and signed the contract.

"*Q.* I understand, then, that the items to be considered were the actual cost of labor and—material?

"*A.* Actual cost of labor and material and twenty per cent. for overhead. Yes, sir.

"*Q.* Will you state whether or not you acted upon that definition in making prices?

"*A.* I did, except where the discounts were given me and I had nothing further to go by. An original order was made out when I took a contract. I made the original order, that was sent to the office, given to the order clerk. The original order is the specification for the machinery or the castings, whatever it was, and the price. * * * I did not know how they figured costs except as told me by Mr. Lemke."

On cross-examination:

"*Q.* So you didn't charge anything, then, for overhead?

"*A.* I didn't put it in that way.

"*Q.* How did you put it?

"*A.* I tried to make what profit I could, which was my instruction.

"*Q.* You don't know whether you added 20 per cent. or not?

"*A.* I am positive I added more than that."

Amongst the exhibits introduced in evidence by defendant were certain so-called cost sheets which

showed 10 per cent. added to material, 150 per cent. to labor and 11 per cent. for selling expense which Lemke testified was the amount he determined upon "when we started, based on doing a greater amount of business * * * when we engaged Mr. Brown." Of the items going to make up overhead charges he enumerated—

"—taxes, fire insurance, indemnity insurance, cyclone insurance, nonproducing help such as supervision, office help, coal, under the boiler, electric lights, electric power and the repairs of the different departments, fixing buildings and roofs, breakage and depreciation, wearing out of small tools such as drills, files, oils, waste, brushes, shovels, picks, chisels, blacksmith coal, belting, grease, paint—"

and testified that these items do not appear in the accounts of each order as shown upon their invoices made up by the cost department and posted into their books, but are determined at the end of the year and they "cannot tell what the overhead is at various times or on various days during the year." Of a statement for earned commissions rendered by plaintiff in October, 1915, amounting to $97.96 paid November 4 by Lemke's direction, he explained that plaintiff told him all the orders it included showed a profit and he did not ask him to wait until the end of the year for them. Of an exhibit containing a list of 47 orders showing name of customer, order number and price of each, dated January 15, 1916, and turned in to defendant for earned commissions, plaintiff testified that when Lemke handed it back to him he said he had marked on the orders those that were correct, that there was no profit on some and others he would have to look up. Three of these orders were marked "no profit," two "loss" and ten "O-K." Of this Lemke testified the O-K indicated the amounts were correct according to the invoices, and he had told plaintiff that when the expenses of the year were compiled and all figured up

they would pay commissions on those he was entitled to.

The testimony of defendant's witnesses as to proper overhead charges and the manner of arriving at them was not altogether in harmony. An expert accountant from Chicago, called by defendant to examine its books in relation to this matter, testified that as he analyzed defendant's expense accounts, to provide properly for overhead charges, "so termed," in the nature of nonproductive labor, taxes, insurance, etc., 219½ per cent should be added to productive labor, which Lemke was willing to admit might be an improvement on his plan.

While several errors are assigned by defendant the only one seriously urged and argued in counsel's brief is the court's admission, against objection, of plaintiff's testimony that prior to signing the agreement Lemke said in reply to his inquiry that costs would be made by adding 20 per cent for overhead to actual cost of labor and material.

It is contended by defendant this testimony violates the elementary rule that contemporary parol evidence is never admissible to contradict or vary the plain terms of a valid written instrument and this written agreement expressly provides that no commission is to be paid on orders filled by the company without profit, in contradiction of which plaintiff was permitted to testify in effect that upon orders not executed at a profit he was to receive a commission if they showed a profit on actual cost of labor and material with 20 per cent. added for overhead, although it is shown there should have been added to actual cost of labor 219½ per cent for overhead and as a matter of fact the orders he claims a commission on were executed at a loss; that the word "profit" has a fixed and definite meaning not subject to change or modification by oral testimony and the written contract is in its provisions complete and unambiguous.

For plaintiff it is denied that the testimony complained of is an attempt to contradict the plain provisions of the written agreement, but its legitimate purpose is to supplement the same, make clear apparent inconsistencies and show in what sense the parties themselves understood and used uncertain and ambiguous words or phrases. The rule invoked upon that proposition is thus well stated in 17 Cyc. p. 682:

"Where any doubt arises as to the true sense and meaning of the words themselves, or any difficulty as to their application under the surrounding circumstances, the sense and meaning of the language may be investigated and ascertained by evidence *dehors* the instrument, for both reason and common sense agree that by no other means can the language of the instrument be made to speak the real mind of the party. In this case parol evidence is admissible *ex necessitate.*"

Defendant's principal contention is that the word "profits" has a fixed and definite primary meaning in merchandizing or manufacturing, signifying the same as *net profits,* construed by the courts to designate acquisition beyond expenditure, or the difference between what it cost to manufacture and sell a commodity and what it brought, citing the well-known case of *Rubber Co.* v. *Goodyear,* 76 U. S. 788, and various other cases so defining profits. It may be noted that in the cases cited by defendant for positive definition the courts were discussing profits arising from a business activity in its entirety or a continuous course of business and not the term "profit," or "at a profit" from each executed order considered separately as provided in this agreement.

That the surrounding circumstances and the connection in which the term "profits" is used in an instrument may present such uncertainty as to render parol evidence admissible for the purpose of ascertaining the sense in which it is used, has been recognized. *Snyder* v. *Seaman,* 37 N. Y. Supp. 696. Neither does a well-

recognized technical meaning of a term necessarily preclude oral evidence of an intended or understood modified meaning, where the circumstances and language in connection with which it is used tend to obscure it and leave in doubt the light in which the parties to the agreement regarded it. The expression "extension of time" has a well-defined legal meaning in connection with negotiable paper, but in sustaining the admission of oral testimony to show a modified sense intended by the parties using it this court said, speaking through Chief Justice Hooker, in *Borden* v. *Fletcher's Estate*, 131 Mich. 220:

"The language used in this writing is not necessarily ambiguous, but, when taken in connection with the circumstances, is susceptible of a different construction from that which its language imports if taken in its technical sense; yet it is doubtful if the sense contended for by the claimant is not that which would be generally understood by persons outside of the profession of the law. (Citing cases.) Parol evidence is admissible to aid in arriving at the intention of the parties in the use of equivocal words in a contract. The rule is stated in 2 Am. & Eng. Enc. Law (2d Ed.), p. 291, as follows:

" 'The true doctrine seems to be that, while direct evidence of intention is not admissible in explanation of ambiguous terms in a writing, yet proof of collateral facts and surrounding circumstances, existing when the instrument was made, may be properly admitted, in order that the court may be placed as nearly as possible in the situation of the testator, or contracting parties, as the case may be, with a view the better to adjudge *in what sense* the language of the instrument was intended to be used, and to apply it to the subject matter.' "

In *Ganson* v. *Madigan*, 15 Wis. 158, it is said of interpretations put upon obscure portions of an agreement by the parties themselves at the time it is made:

"If evidence of surrounding facts and circumstances is admitted to explain the sense in which the words were used, certainly proof of the declarations of the parties, made at the time of their understanding of

them, ought not to be excluded. (Citing cases.) Such declarations, if satisfactorily established, would seem to be stronger and more conclusive evidence of the intention of the parties than proof of facts and circumstances, since they come more nearly to direct evidence than any to be obtained, whilst the other is but circumstantial."

In this case the agreement did not define costs, which are an essential in determining profit, in a sense a collateral matter making the meaning of the contract as to that provision uncertain, and it could be contended with reason that the oral testimony was admissible because the incomplete written instrument does not express the entire agreement, or understanding, of the parties in that particular. This agreement was prepared by defendant's president. Its doubtful or incomplete provisions are not to be construed to defendant's advantage. As a legal document it is imperfect and shows its informality on its face. In *Butler* v. *Iron Cliffs Co.*, 96 Mich. 70, the applicable rule in such cases is quoted with approval from Jones on Construction of Commercial and Trade Contracts, § 134, as follows:

"The test of the completeness of the writing proposed as a contract is the writing itself. If this bears evidence of careful preparation, of a deliberate regard for the many questions which would naturally arise out of the subject-matter of the contract, and if it is reasonable to conclude from it that the parties have therein expressed their final intentions in regard to the matters within the scope of the writing, then it will be deemed a complete and unalterable exposition of such intentions. If, on the other hand, the writing shows its informality on its face, there will be no presumption that it contains all the terms of the contract. In every case, therefore, the writing must be critically examined in the light of its surrounding circumstances, with a view of determining whether it is a memorial of the transaction."

This contract provided that plaintiff should carry

out such instructions as defendant might communicate to him from time to time. The oral testimony as to what defendant's president said when they made the contract was both in the nature of an instruction and his interpretation of what he had just written. Lemke testified that he told plaintiff he would be furnished with prices from time to time and be told what to charge; that he was required to use the catalogue and discount sheets furnished him "in getting his costs;" that on special orders, or "original jobs," estimates showing the cost were made by different men in different departments upon the cost of specially made articles and furnished plaintiff to aid him in fixing prices "high enough to cover the estimate at a profit." Plaintiff testified that he so used the information furnished him and followed instructions, not knowing how they figured costs except as Lemke told him. It is not claimed Lemke told him to include 219½ per cent. added to productive labor, or 150 per cent. to labor with 10 per cent. to material and 11 per cent for selling expense, which did not appear in the invoices of the orders made up by the cost department, nor as they were posted in the books. The costs contended for by defendant at the trial were made up of a large number of items which plaintiff did not and could not know as orders were placed, which Lemke himself stated would be determined at the end of the year and could not be told at various times or on various days during the year. This contract drawn by Lemke contemplated payment of commissions from time to time on individual orders 30 days after an order sold at a profit had been paid for, necessitating for each transaction a basis on which profits could be determined within that time, manifestly inconsistent with defendant's present theory.

It appears from defendant's evidence that there are different ways of determining costs, or whether an

order was executed at a profit, and it has been held that when an employee is to have a per cent. of the net profits when realized on certain contracts, only necessary expenses or disbursements on account of such contracts are to be deducted, and not all the expenses incidental to management of the employer's business. *In re British Columbia, etc., Saw Mill Co.,* 25 L. T. Rep. (N. S.) 653.

It cannot be said that the terms "profit," or "at a profit" have such fixed and inflexible meaning as to preclude modification in whatever connection used. This writing in itself does not so plainly express the full and final intention of the parties upon the question in controversy, which is naturally a matter within its scope, as to preclude resort to oral testimony to determine its meaning. For the purpose proposed we think the testimony was admissible.

The judgment is therefore affirmed.

OSTRANDER, C. J., and BIRD, MOORE, BROOKE, FELLOWS, STONE, and KUHN, JJ., concurred.