### DETROIT EDISON COMPANY *v.* ZONER.

OPINION OF THE COURT.

1. PUBLIC UTILITIES—LANDS—CONDEMNATION.

An electric power corporation has the power to condemn property necessary to generate or transmit electric energy for public use (CL 1948, § 486.251 *et seq.*, as amended).

2. APPEAL AND ERROR—PROBATE COURT.

Judgments of a probate court that are not tried *de novo* on appeal to a circuit court are appealable directly to the Court of Appeals (GCR 1963, 806.1).

3. EMINENT DOMAIN—NATURE OF PROCEEDING—PRETRIAL CONFERENCE.

The general court rules of 1963 do not govern proceedings in a probate court; therefore, a pretrial conference is not required in an action by an electric power company in probate court to condemn the fee in lands for a high-voltage transmission line, because not mentioned in the probate court rules, even though it is now adversary rather than inquisitorial, in nature (Const 1963, art 10, § 2; GCR 1963, 11.1).

4. CONTRACTS—WRITING—PAROL EVIDENCE.

Parol evidence of prior negotiations cannot be admitted to vary a written contract when that contract is clear and unambiguous.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 26 Am Jur 2d, Eminent Domain § 56.
[2] 4 Am Jur 2d, Appeal and Error §§ 17, 47, 48, 146.
[3] 26 Am Jur 2d, Eminent Domain §§ 375, 377, 379, 380, 385, 399.
[4, 5] 30 Am Jur 2d, Evidence § 1016.
[6] 27 Am Jur 2d, Eminent Domain § 418.
[7] 31 Am Jur 2d, Expert and Opinion Evidence § 181.
[8] 26 Am Jur 2d, Eminent Domain § 138.
[9] 27 Am Jur 2d, Eminent Domain §§ 446, 447.
[10] 30 Am Jur 2d, Evidence § 1017.
[11, 12] 30 Am Jur 2d, Evidence § 1016.
[13] 17 Am Jur 2d, Contracts §§ 240–244.
[14–16] 17 Am Jur 2d, Contracts § 244; 30 Am Jur 2d, Evidence § 1016.

5. SAME—WRITING—PAROL EVIDENCE—EASEMENT.

Parol evidence of prior negotiations concerning a grant of an easement to an electric company for the construction of a high power line when technical aspects of the power line were not described in the writing *held,* properly excluded where the written easement does not require restrictions of technology because it is reasonable to expect changes in technical aspects over a period of years.

6. SAME—PAROL EVIDENCE—INSTRUCTIONS TO JURY.

It was not error for the trial judge to refuse to give a requested instruction to a condemnation commission that would have had the practical effect of negating the court's prior ruling barring certain parol evidence.

7. EVIDENCE—EXPERT TESTIMONY—WITNESSES—CREDIBILITY.

The trier of fact may disregard the whole of the testimony of an expert witness or give credence to that part of the testimony which is supported by other evidence if the testimony of the expert witness is false in one respect.

8. PUBLIC UTILITIES—CONDEMNATION—NECESSITY.

Finding by the trial court that it was necessary for an electric power company to take a fee interest rather than an easement in land over which a high voltage power line is to pass *held,* supported by evidence that power company insisted on prohibition against structures under lines or near towers and removal of trees which might interfere with lines, all for safety reasons.

9. SAME—CONDEMNATION—PROCEDURE.

Action by probate court in confirming a condemnation award while a contemporaneous action on related subject matter was pending in circuit court was not error because theoretical or possible influences on a given case by pending or potential collateral cases should not delay disposition of present business.

DISSENTING OPINION.

LEVIN, J.

10. CONTRACTS—PAROL EVIDENCE RULE.

*The parol evidence rule is a rule of substantive law and not merely a rule of evidence; its purpose is to protect the stability of transactions evidenced by writings.*

11. SAME—PAROL EVIDENCE RULE.

*The parol evidence rule does not prevent the trial judge from considering extrinsic evidence on the question of whether the parties entered into an oral understanding that was not embodied in subsequently executed written contract, whether the parties intended the writing to replace the antecedent oral agreement, and on the meaning intended by the parties of the words used in the agreement.*

12. SAME—INTENTION OF PARTIES.

*The trial court, in an action for condemnation where the meaning of an easement is in dispute, and where the landowner asserts that there was an antecedent oral agreement between himself (a layman) and an agent of the condemnor, should not try to determine whether there was in fact an antecedent agreement, whether a subsequent written agreement was intended to replace it, and what the parties intended the words in the written agreement to mean, by reading the written agreement without reference to a testimonial record.*

13. SAME—CONSTRUCTION—INTENTION OF PARTIES.

*The rule of interpreting contracts to which all other rules are subordinate is that a writing is to be interpreted so as to ascertain and effectuate the intent of the parties.*

14. SAME—CONSTRUCTION—INTENTION OF PARTIES—EXTRINSIC EVIDENCE.

*Extrinsic evidence is admissible to determine whether the parties to a written agreement intended the writing to be the complete agreement between them and what meaning they intended to give the words used in it.*

15. SAME—INTERPRETATION—INTENTION OF PARTIES—EXTRINSIC EVIDENCE.

*A court may be making a contract for the parties that they themselves did not make when it enforces a contract in accordance with an interpretation that seems plain and clear to the court, but excludes relevant convincing evidence that the parties intended a different interpretation.*

16. SAME—AMBIGUITY—INTERPRETATION—EXTRINSIC EVIDENCE.

*Extrinsic evidence is admissible to prove existence of an ambiguity in a written instrument as well as to resolve an ambiguity proven to exist.*

Appeal from Probate Court of Oakland, Barnard (Norman R.), J. Submitted Division 2 June 7, 1967,

at Detroit.   (Docket No. 2,338.)   Decided July 31, 1968.   Leave to appeal denied October 11, 1968.   See 381 Mich 783.

Petition by the Detroit Edison Company, a New York corporation, to acquire by condemnation the fee in certain land owned by John C. Zoner and Marion Carey Zoner, his wife.   Petition granted and award of compensation made.   Defendants appeal. Affirmed.

*Fischer, Sprague, Franklin & Ford* (*Ralph H. Houghton, Jr.,* of counsel), for petitioner.

*John T. Rogers,* for respondents.

McGREGOR, J.   In June, 1965, the Detroit Edison Company filed a petition pursuant to CL 1948, § 486.251 *et seq.* as amended (Stat Ann 1968 Cum Supp § 22.1671 *et seq.*) for condemnation in the probate court for Oakland county, seeking to acquire a fee interest in a 200-foot wide strip of land across defendants' property.   The use avowedly planned for this strip was the construction of a major high-power transmission line to assist the power company in meeting increasing demands for electrical power in southeastern Michigan.   Since 1956 there had existed between the parties a written instrument which conveyed an easement right to Detroit Edison in the identical strip for purposes of constructing a tower transmission line thereon.   Expert witnesses testified that the existence of the easement and towers presently constructed thereon affected their valuations.

This case was heard by a condemnation commission under the rules of the probate court.   The commission was instructed in the law by the probate

judge and returned a report setting damages to the
defendants of $11,390 and this award was confirmed
by the probate court.   By virtue of GCR 1963, 806.1,
final judgments in probate courts are appealable
directly to this Court if they are not triable *de novo*
in the circuit court.   Condemnation actions by water,
electricity, and gas companies are not triable *de
novo* in the circuit courts, and thus are appealable
directly to the Court of Appeals.  *In re petition of
Detroit Edison Company* (1961), 365 Mich 35;
*Michigan Gas Storage Co.* v. *Gregory* (1954), 341
Mich 34.   Such a procedure has been followed in
this case.

Defendants raise these five general claims of error
on appeal: that they were improperly denied a pre-
trial conference; that the parol evidence rule was
improperly applied to exclude oral negotiations sur-
rounding the 1956 easement grant; that the probate
judge improperly refused certain requested charges
to the condemnation commission; that the question
of necessity for taking a fee interest was not proved;
and that the probate court improperly affirmed the
award while there was a contemporaneous trial in
the circuit court which claimed fraud in the 1956
easement grant.

When the present court rule 301 was first promul-
gated, pre-trial conferences were not required in
condemnation cases.   See Committee Notes, 2 Honig-
man & Hawkins, Michigan Court Rules Annotated
(2d ed), p 5.   Since that first promulgation, the
theory of a condemnation case has changed from
being inquisitorial in nature to being a contested
judicial action by the adoption of the 1963 Michigan
Constitution, specifically art. 10, § 2.   The theory
of this change is set out in *State Highway Commis-
sioner* v. *Lindow* (1966), 4 Mich App 496.   Defend-
ants make the argument that they were improperly

denied a pre-trial conference under the *Lindow* precedent and under the wording of GCR 1963, 301.1:

"In every contested civil action the court shall direct the attorneys for the parties to appear before it for a conference."

The general court rules do not generally govern the practice in probate court. GCR 1963, 11.1. Separate rules are established in Michigan for probate practice. Honigman & Hawkins, Manual of Michigan Rules (1963), 331–339. The power and supply companies condemnation statute is silent in regard to pre-trial conferences. It is the opinion of this Court that it was not error in this case for the probate court to have denied the motion for a formal pre-trial conference. Our conclusion is reinforced by the fact that an informal pre-trial conference was held and the defendants have made no showing of prejudice by the denial of a formal conference.

It is the general and Michigan rule that where a contract is clear and unambiguous, parol evidence of negotiations cannot be admitted to vary the contract. *Salzman* v. *Maldaver* (1946), 315 Mich 403; *D. N. Osborne and Co.* v. *Wigent* (1901), 127 Mich 624; 32A CJS, Evidence, § 851, p 211; 30 Am Jur 2d, Evidence, § 1029, p 164. The easement contract clearly called for the erection of a high-power tower transmission line. Defendants argue that they sought to introduce evidence that would show that the easement granted was only for smaller towers than the power company now plans to construct, and which would carry less power than is now proposed. They argue that the proffered evidence would show implied conditions and that the power company was seeking to increase improperly the

burden of the easement, in violation of the precedent of *Delaney* v. *Pond* (1957), 350 Mich 685.

The easement grant clearly allowed the construction of a high-power line. Technical aspects of the transmission line were not denoted in the contracts, nor would we have expected as much. Science and technology do not stand still. Reasonable men would expect some change in tower design, capacity, or material composition in the span of a decade. The law does not require the cessation of scientific advancement and in this case, will not permit the parties to claim they contracted to such a cessation a decade ago, when the written contract itself is clear and does not require such a finding. Defendants' parol evidence was properly excluded.

One of the two rejected charges proposed by the appellants was worded in such a manner that it would have included much of the same information concerning the negotiations surrounding the 1956 easement grant which was excluded under the parol evidence rule. We have ruled that the exclusion of the evidence of negotiations was not erroneous. It also was not erroneous to refuse to give the requested charge which would have negated the parol evidence ruling for practical purposes.

The other requested charge was that if the commission found a part of the testimony of an expert witness was incorrect or based on a false premise, then the entire testimony must be disregarded. Such a charge would have been erroneous. If the testimony was false in one respect, the commission could have, in its discretion, disregarded all of the testimony, or it could have given credence to that testimony supported by other evidence. *People* v. *Hunter* (1963), 370 Mich 262; *Western Michigan University* v. *Slavin* (1967), 6 Mich App 291.

On the question of necessity, the defendants argue that there was no proof of the necessity of taking a

fee interest in the land. This argument is based on
an excerpt of testimony of a witness for the power
company which indicated that one of the reasons for
seeking a fee interest in the strip arose out of a
sense of fairness to the property owners. Com-
plaints had been received from owners of other
property encumbered by easements for similar con-
struction, that the landowners should not have to
pay taxes on the land under the power lines, of
which they had only a very restricted use. The
defendants argue that a sense of fairness towards
the landowners is not a showing of necessity and
that the individual landowners are the best judges
of fairness in any given case. Defendants, in pro-
posing this argument, seem completely to ignore
additional testimony which tended to show a need
for a fee interest in the strip of land which lies
under and to either side of the power lines. Evi-
dence was introduced of factors associated with the
line construction and maintenance which would be
inconsistent with anything except a fee ownership.
The power company insists upon a prohibition
against structures under the line or near the towers,
primarily because of the danger of a fire damaging
the line so as to cause a major power failure. The
power company also cuts down all trees which would
in any way interfere with the power line. It is the
opinion of this Court that the condemnation com-
mission had sufficient evidence upon which to base
its findings of the necessity for the taking of a fee
interest.

Finally, defendants claim that the probate court
erred in affirming the award while there was a con-
temporaneous action pending in the circuit court,
claiming fraud in the 1956 easement grant. It
would have been preferable to have all possible
litigation disposed of before the confirmation in this
case, however, courts must move with dispatch on

the cases before them. Theoretical or possible influence on a given case by pending or potential collateral cases should not oversway court rulings. At the time of confirmation of the award, this case was complete and the court explicitly followed the confirmation statute. CL 1948, § 486.252(e) [Stat Ann 1968 Cum Supp § 22.1672(5)]. We find no reversible error in the confirmation of the award.

The judgment of the probate court is affirmed. Costs to appellees.

FITZGERALD, P. J., concurred with McGREGOR, J.

LEVIN, J. (*dissenting*). In 1956 the Zoners signed Detroit Edison's printed form tower line permit and received $2,000. The permit or easement granted Edison

"the right to construct, operate and maintain its lines for transmission and distribution of electricity and company communication facilities, including the necessary towers, fixtures, wires and equipment"

over a 200 foot wide corridor running through the Zoner property and requires payment to the Zoners of an additional $400 for each tower erected.

Nine years later, in 1965, Detroit Edison commenced these proceedings to condemn the fee simple interest in the 200 foot corridor covered by the easement. The condemned lands were sought by Detroit Edison for the construction of a 345,000 volt power line, a line considerably larger than any theretofore constructed in Michigan. The line is to be supported on towers roughly 50% higher than the average or normal tower theretofore built in the State with corresponding enlargement of the base of the tower. Two 141 foot towers and one 126 foot tower will be constructed on the Zoner portion of the corridor.

The easement obtained in 1956 was acquired for the construction of the 345 KV line, which was then in the planning stage; there is no evidence as to whether this was disclosed to the Zoners.

At the hearing the Zoners sought to establish through Mr. Zoner's testimony that Detroit Edison's right-of-way man had advised Mr. Zoner before the Zoners signed the tower line permit that the height of the towers would not exceed the height of towers theretofore constructed in Michigan and specifically that the height of the towers that would be constructed on the Zoner land would not exceed 85 to 90 feet. The trial judge refused to permit that testimony to be heard by the commissioners and a separate record was made *after* the judge had ruled the testimony inadmissible. The testimony was excluded under the parol evidence rule.

Detroit Edison's expert witness predicated his evaluation of the Zoner property sought to be condemned in fee simple on the assumption that Detroit Edison already had the right under the 1956 easement to build thereon the 345 KV line. At trial and now on this appeal Detroit Edison successfully contends that the words in the easement grant mean lines and towers of any size and height without limitation. The Zoners asserted then and now again unsuccessfully assert that the words mean lines and towers no larger than those theretofore known in this State, both as a matter of construction of the language used in the easement and because that is the meaning which both parties, the Zoners and Detroit Edison through its right-of-way man, agreed upon before the easement was signed.[1]

---

[1] The trial judge in his instructions to the commissioners did not adopt either Detroit Edison's or the Zoner's interpretation of the scope of the easement and left the commissioners completely uninstructed on the meaning of the words and refused to give an instruction requested by the Zoners.

The function of the parol evidence rule, a rule of substantive law, not of evidence,[2] is to protect the stability of transactions evidenced by writings by excluding relevant evidence of probative value lest the content of the writing be emasculated at the hands of a jury.[3]

The rule does not, however, prevent the judge,[4] who traditionally interprets a writing, from con-

---

[2] Restatement, Contracts, § 237, comment a; Corbin on Contracts, § 573; McCormick on Evidence, § 213; Wigmore on Evidence, § 2400.

[3] McCormick on Evidence, §§ 211, 212, 214–216, pp 429–442.

[4] A question neither briefed nor argued and one which in a sense need not be decided in order to decide this case, but nevertheless a question central to the whole controversy regarding the parol evidence rule and its application in particular cases, is the question whether a conflict in the testimony and other evidence regarding the making of an oral antecedent agreement and, if made, whether it was intended to survive execution of the subsequently signed writing, shall be decided by the judge or a jury. Professor Corbin has observed:

"The question whether the parties have assented to a specific writing as a complete and accurate integration of the terms of their contract is always a question of fact. Generally, it seems to have been determined, or an affirmative answer assumed, by the court. Probably it is wise, in most cases, for the court to assume the burden of determining this issue of fact, although it is never wise to assume an affirmative answer. There must be many cases, however, in which the evidence of what the parties said and did, before and at the time of preparing or delivering a writing, is so nearly equal in weight and credibility that the court will desire the aid of a jury's verdict. If so, there is no law against getting such aid.

"The question of interpretation of the language of a writing has nearly always been treated as a question for the court. It, too, is a question of fact and not of law, except where the words are in a stereotyped form such that the court decisions now require a single interpretation. If the question is whether certain offered testimony does in fact vary or contradict the writing, it is for the court to answer, since it necessarily involves the interpretation of specific language and the determination of its legal operation." Corbin on Contracts, § 595, pp 571, 572.

The issues (i) whether a prior oral agreement was in fact entered into, (ii) if entered into, whether the parties intended that the subsequent writing replace the oral agreement, (iii) the interpretation of the words used in the writing, (iv) the determination whether the alleged oral agreement so contradicts the written agreement as to bar adoption of the oral agreement, and (v) the factual disputes concerning the same, are all so intertwined that, having in mind the purpose of the parol evidence rule, protection of the writing, it would appear better in any case where the application of the parol evidence rule is fairly debatable to let a judge decide all those questions subject to the power of the appellate courts' to reverse clearly erroneous fact findings. Compare *People* v. *Walker* (1965), 374

sidering extrinsic evidence on the 3 critical issues
which are

(1) Did the parties enter into an oral understand-
ing before the writing was executed that was not
embodied in the writing?

(2) Did the parties intend the writing to replace
the alleged antecedent oral understanding?

(3) The meaning of the words used in the writing
intended by the parties.

In this case, both the trial judge, and now a
majority of this Court, rule that the words used in
the easement grant are so plain and clear that one
can decide by looking at them, without the benefit
of a testimonial record, that there was no oral agree-
ment regarding the height and size of the towers
and, if there was any such oral agreement, both
parties intended that such oral agreement be merged
into and superseded by the writing, and what the
parties intended by the words used in the writing.

In reaching that result, there being no extrinsic
evidence of record, the trial judge and the majority
of this Court must have applied an objective stand-
ard, *i.e.,* no reasonable man would have entered into
such an oral agreement and failed to insist on its
inclusion in the writing and no reasonable man could
have understood the words used in the writing to
mean towers no larger than those theretofore built
in Michigan (see footnote 7 and accompanying text).

In passing upon such matters judges should, I
most respectfully submit, be especially cautious. It
is one thing for a judge to hypothesize a reasonable
man for judging an experience he may share on the

---

Mich 331, 337, 338. If it became well established that that was the
manner in which all such questions are to be decided there would,
in my opinion, be less concern regarding the use of parol evidence,
and the precedents in this most convoluted area of the law would
become more uniform and the results more consistent. See Mc-
Cormick on Evidence, § 216, p 439, for an enlightening analysis of
the issue discussed in this footnote.

same plane with laymen. It is quite another to attempt the same feat in an area where the judge is not a layman but an expert. Few laymen are as likely to look upon the oral statements of a representative of a respected utility company with the jaundiced eye of one experienced in law. Laymen, not lawyers, negotiated and signed the writing before us. As laymen, the Zoners are much more likely than a lawyer, who is subconsciously devoted to the parol evidence rule and aware of its possible impact, to enter into an oral understanding intended to survive execution of a contemplated writing. In such matters we need the light a testimonial record can provide, which alone will enable us to peer through the looking glass, and look beyond our own linguistic and professional experience to the world beyond where dwell those whose controversies we judge and whose life experience and approach to legal documents is likely to be different than ours.

With such a testimonial record before him, a judge can decide, giving due and solemn weight to the printed word, whether the alleged antecedent oral agreement was in fact entered into and, if so, whether it was in fact intended to survive the execution of the writing and the meaning of the words used in the writing intended by the parties when it was signed.

The foregoing is consistent with the cardinal rule for construing writings, to which *all* other rules are subordinate, namely, that a writing shall be interpreted so as to ascertain and make effective the intention of the parties.[5] Our Supreme Court and

[5] "The cardinal rule in the interpretation of contracts is to ascertain the intention of the parties. To this rule all others are subordinate." *McIntosh* v. *Groomes* (1924), 227 Mich 215, 218 (parol evidence admissible to show whether an obligation to pay "from the sale of said valves the sum of one thousand dollars per annum, payable at the rate of ten cents for each and every valve sold," required a minimum payment of $1,000.00 per year).

other courts have said and done just that in cases like the one at bar.

On the use of parol evidence to show whether the writing before the court was intended to represent all the agreements of the parties, Professor Corbin observed:

"The writing cannot prove its own completeness and accuracy. Even though it contains an express statement to that effect, the assent of the parties thereto must still be proved. Proof of its completeness and accuracy, discharging all antecedent agreements, must be made in large part by the oral testimony of parties and other witnesses. The very testimony that the 'parol evidence rule' is supposed to exclude is frequently, if not always, necessary before the court can determine that the parties have agreed upon the writing as a complete and accurate statement of terms. * * *

"There is ample judicial authority showing that, in determining the issue of completeness of the integration in writing, evidence extrinsic to the writing itself is admissible. * * *

"It would have been far better had no such rule ever been stated. Instead, attention should be called to the accepted rule that parties can by a substituted contract discharge and annul any and all of their previously made contracts. Then the question should be put: Have the parties in the instant case made such a substituted contract? On this issue of fact, no relevant testimony should be excluded; it should all be observed and weighed with the clear and critical eye of experience. This is what the wiser courts, seeking justice in each case, have in truth been doing." Corbin on Contracts, § 582, pp 448–451, 455.

On the use of parol evidence to show the meaning given by the parties to the words they used in a writing, the following from the Restatement of Contracts is instructive:

"§ 242. Effect of Prior Negotiations.

"Previous negotiations between parties to an integrated agreement, whether the negotiations relate to that agreement or to another, are admissible to show that the agreement has any meaning which is not *impossible* under the standard stated in § 230, though that meaning would not otherwise have been given to the agreement.

"Comment:

"a. Where the parties by the language they have employed leave their meaning obscure and uncertain when applied to the subject-matter, then the expressions and general tenor of speech used in the previous negotiations, *even if coming as they usually must from one or the other of the parties themselves,* are admissible to show the conditions existing at the time when the writing was made.[6] And even where the writing is not ambiguous on its face, the circumstances under which the parties contract may be looked at to establish an ambiguity, as well as to indicate the proper choice of *possible* meanings; and the common knowledge and the understanding of the parties themselves as shown by their previous negotiations is sometimes such a circumstance. There is, however, a limit to the application of the rule stated in the Section. Previous negotiations cannot give to an integrated agreement a meaning *completely alien* to anything its words can *possibly* express." (Emphasis supplied.)[7]

One of Professor Corbin's greatest contributions was his work on the interpretation of writings and the bearing thereon of the parol evidence rule. He attempted to summarize as tentative rules of substantive law the principles which he had gleaned from his work; these include the following:

---

[6] The comment to this point was taken from *Smith v. Vose & Sons Piano Co.* (1907), 194 Mass 193 (80 NE 527, 9 LRA NS 966).

[7] Restatement, Contracts, § 242. The reference to § 230 would appear to preclude use of parol evidence under § 242 to attach a meaning to the writing which no reasonably intelligent, fully informed person would place thereon.

"The primary and ultimate purpose of interpretation is to determine and make effective the *Intention of the Contracting Parties.*"  (Emphasis by author.)

"No party to a contract should ever be bound by an interpretation that is determined exclusively by the linguistic education and experience of the judge."

"When a court excludes all relevant evidence of the meaning given to the words of a contract by the parties thereto, it is giving weight exclusively to its own linguistic education and experience."

"When a court enforces a contract in accordance with an interpretation that seems 'plain and clear' to the court and excludes relevant convincing evidence that the parties intended a different interpretation, it is 'making a contract for the parties', one that they did not make."

"No word or group of words in any language has an 'objective' meaning separate from and independent of its actual use by some person to convey his thought to another person."

"No writing, whatever its form and content, is sufficient to establish its existence and operation as an 'integration' assented to as such by the parties."

"When a valid contract is made (oral or written), the parties thereby discharge and displace antecedent agreements and negotiations (oral or written) that are inconsistent with it."

"Relevant evidence, oral or written, offered by one party to prove an interpretation actually given by the other party, or to prove that the other party knew or had reason to know an interpretation actually given by the first party, is not rendered inadmissible by the fact that the words interpreted are contained in an integrated writing."[8]

8 Corbin on Contracts, 1964 pocket parts, § 572B.

Under the foregoing, parol evidence is admissible to show that there was an antecedent oral agreement not intended by the parties to be integrated into the writing and also to prove an interpretation actually given by both parties to words contained in an integrated writing not *inconsistent* with the writing itself.[9]

---

[9] Similarly in the following cases parol evidence was held admissible to show the meaning ascribed by the parties to the words they used in their writings:

*New Amsterdam Casualty Company* v. *Sokolowski* (1965), 374 Mich 340 (indebtedness to "subcontractors"; held not to mean indebtedness incurred before a certain date); *Roy Annett, Inc.,* v. *Killin* (1961), 365 Mich 389 (whether a sale made after the expiration of a listing agreement was a sale made "by the *owner* within 6 months thereafter" where it was made through another broker); *Brown* v. *A. F. Bartlett & Co.* (1918), 201 Mich 268 (meaning of term "profit"; instructive opinion).

*Berke Moore Co.,* v. *Phoenix Bridge Co.,* (1953), 98 NH 261 (98 A2d 150) (whether plaintiff was entitled to payment for the number of square yards of concrete included in all the outer surfaces of a bridge deck, including top, bottom and sides and in the surfaces of the curbs under a contract providing that the quantity of concrete to be paid for "shall be the number of square yards of concrete surface included in the bridge deck, including the sidewalk. The concrete curbs shall be considered incidental to this item."); *Mazzotta* v. *Bornstein* (1926), 104 Conn 430 (133 A 677, 680) (after hearing parol evidence, held that "working days" was not intended to include days performance of work was prevented by storms but did include cold days); *Smith* v. *Vose & Sons Piano Co., supra* (contract to procure "water" by drilling; held proper to show understanding of parties that fresh water, not salt, was meant); *W. G. Maltby, Inc.,* v. *Associated Realty Co.* (1932), 114 Conn 283 (158 A 548) ("2 inch steam line"); *Green Island Water Supply Co.* v. *Trojan Laundry Co.* (1908), 126 App Div 584 (110 NYS 508) ("taken from a two inch meter"); *Streppone* v. *Lennon* (1894), 143 NY 626 (37 NE 638) (oral agreement to show that written contract to do brickwork on building was not intended to require contractor to furnish the brick); *Purity Stores Ltd.* v. *Linda Mar Shopping Center, Inc.,* (1960), 177 Cal App 2d 568 (2 Cal Rptr 397) (whether the term "groceries" as used in a lease covenant granting an exclusive right to sell groceries in a shopping center included the right to sell beer); *Fricke* v. *Braden* (1942), 55 Cal App 2d 266 (130 P2d 727) ("supermarket"); *Hammond* v. *Capitol City Mutual Fire Ins. Co.* (1912), 151 Wis 62 (138 NW 92, Ann Cas 1914C 57) (whether fire insurance policy to "Hammond Bros." covered individual property of partners); *Ethredge* v. *Diamond Drill Contracting Co.* (1938), 196 Wash 483, 83 P2d 364 (whether "drilling" in a particular clause of an oil well contract meant "drilling on the bottom of the hole"); *Beason* v. *Kurz* (1886), 66 Wis 448 (29 NW 230) (whether inside plaster walls were to be painted under a contract requiring painting of "the entire walls of

In *Magee* v. *Brown* (1957), 347 Mich 638, the term "retail hardware business" was used in a covenant not to compete.  After consideration of extensive testimony concerning the pre-closing negotiations of the parties and other matters, it was held that the term was not intended by the parties to cover retail sales made in connection with factory mill supply and manufacturing operations, a separate business of the covenantor.

The Court in *In re Traub Estate* (1958), 354 Mich 263 found an agreement to make a will leaving certain shares of stock to "Robert Traub" ambiguous on the issue whether Robert's daughter was entitled to the stock if he predeceased the contracting testator, declaring, p 280:

"in event of ambiguity in an instrument we make use of all possible aids in construction, the parol evidence rule to the contrary notwithstanding.  3 Corbin, Contracts, § 579, p 250 [pp 420, 421 in 1960 ed] states the principle with clarity:

" 'As long as the court is aware that there may be doubt and ambiguity and uncertainty in the meaning and application of agreed language, it will welcome testimony as to antecedent agreements, communications, and other factors that may help to decide the issue.' "

In *McCarty* v. *Mercury Metalcraft Company* (1964), 372 Mich 567, plaintiff salesman sued for

---

the building, inside and outside."); *Stoops* v. *Smith* (1868), 100 Mass 63 (defendant's statements to plaintiff as to kind of chart he would publish received as evidence of meaning of "advertising chart"); *Bair* v. *School District No. 141, Smith County* (1915), 94 Kan 144 (146 P 347) (the understanding of the parties as to what was meant by the provision requiring "the architect to make *necessary* visits at intervals"); *Louisville & N R Co.* v. *Illinois C R Co.* (1898), 174 Ill 448 (51 NE 824) ("necessary signals and switchmen"); *Air Conditioning Corp.* v. *Honaker* (1938), 296 Ill App 221 (16 NE2d 153) (meaning of "air conditioner" in sale contract); *Atlantic Northern Air Lines, Inc.* v. *Schwimmer* (1953), 12 NJ 293 (96 A2d 652) (antecedent negotiations and attendant circumstances to show intended scope of release of "all claims").

commissions under a contract which obligated the defendant to pay plaintiff 5% of all orders he secured. The defendant-appellant claimed the words "all orders" was meant to include only prototype orders and not orders for production. After listening to parol testimony the trial judge indicated he found no ambiguity, presumably, said our Supreme Court, because he had found plaintiff's testimony not so unequivocally in agreement with defendant's in regard to the meaning of the term "all orders". That factual finding of no ambiguity was held on appeal to have been one that could reasonably have been made from the testimony adduced. In so holding the Supreme Court observed that a latent ambiguity is one

" 'where the language employed is clear and intelligible and suggests but a single meaning, but some extrinsic fact or extraneous evidence creates a necessity for interpretation or a choice among 2 or more possible meanings [citation omitted].' Since the detection of a latent ambiguity requires a consideration of factors outside the instrument itself, extrinsic evidence *is obviously admissible to prove the existence of the ambiguity,* as well as to resolve any ambiguity proven to exist." (Id, p 575, emphasis supplied.)

There is a substantial number of cases on the question of whether parol evidence is admissible to show a maximum construction cost was orally agreed upon although the written contract with the architect or builder does not reflect the same, the great majority holding the evidence admissible.[10] Similarly, parol evidence is admissible to show an oral limitation on the maximum height of a tower.

---

[10] Annotations: Application of parol evidence rule in action or contract for architect's services, 49 ALR2d 679, 680; Admissibility of parol evidence on cost of structure in builder's action on written cost-plus-fee construction contract, 84 ALR2d 1324.

The trial judge should have listened to the testimony concerning the alleged oral agreement regarding tower height and size before he made up his mind that there was no such agreement and, if there was any such agreement, that it was merged into the writing, and what meaning the parties intended to give the words used in the writing. Had he done so, he might well have concluded that the position being pressed by the Zoners was not as "impossible" as his ruling and that of this Court would make it appear.

From what little does appear in the record, I think it entirely possible that the alleged agreement was entered into between the Zoners and Edison's right-of-way man. The words used in the easement grant need clarification. What kind of electrical lines? What kind of towers? It would have been natural and normal to have asked those questions. If Mr. Zoner did in fact ask those questions of the right-of-way man before signing the easement agreement and the latter did reply that "lines" meant high tension lines and "towers" meant "high rise steel towers", I think it entirely possible that Mr. Zoner then would have gone on to ask the right-of-way man the size or height of the towers. If he did and the right-of-way man replied, as Mr. Zoner testified, "normal towers," towers like you have seen around, towers not exceeding 85 to 90 feet in height, as presently visible in Michigan, then that is what the words meant to the parties and no court should substitute its understanding of those words for the agreement the parties themselves made before the writing was signed.[11]

---

[11] In *Delaney* v. *Pond* (1957), 350 Mich 685, the Court declared (p 687) "A principle which underlies the use of all easements is that the owner of an easement cannot materially increase the burden of it upon the servient estate or impose thereon a new and additional burden." But as I see it, that principle does not come into play until the easement agreement is first correctly construed.

Detroit Edison, no doubt, desires to be protected against being called upon to produce former employees, who may be unavailable, to refute possibly perjurious testimony; it may well believe its valuable easement rights would be unsettled by any rule of law which would impose that obligation. Detroit Edison can, however, largely protect itself against such an eventuality by the simple expedient of drafting its instruments so that all who read can understand what they mean. If Detroit Edison desires to obtain the right to build a "high tension power line," it might consider using those words instead of the words "electrical lines." If it desires to obtain the right to build "towers of unlimited size and height," it might consider saying that in so many words.

True the words used by Detroit Edison in its tower line permit comprehend an electrical transmission system of the dimensions Detroit Edison claims it has the right to build, but those words also lend themselves to the more limited interpretation for which the Zoners contend; an interpretation which may well have been in keeping with their linguistic experience and that of the right-of-way man.[12] Of course, Detroit Edison can draw its agreements any way it wishes without any advice from the writer, but it seems to me that if it prefers terseness to clarity it can reasonably expect that a question may be asked by a land owner before signing concerning the meaning of the cryptic words which it chooses to use. And if such questions are put and answered in the manner the Zoners contend they were, Detroit Edison should not be heard, having drafted the document in the form stated, to say that, even if a judge is persuaded to listen and he

---

[12] The right-of-way man may not have known the easement was sought by Detroit Edison for a significantly larger transmission line than anything theretofore built in Michigan.

decides such an antecedent oral agreement was made and intended to survive execution of the writing, even if he concludes both the landowner and the right-of-way man agreed that "towers" means "towers no larger than those which have heretofore been built in this state", a court may, nevertheless, substitute its own "objective" interpretation for that of the parties.

After the opinions in this case were released to the parties, but before they were released for publication by the State Reporter, the Michigan Supreme Court decided *Keller* v. *Paulos Land Company* (1968), 381 Mich 355. In that case, a land contract provided that the land contract purchaser would enjoy a "non-exclusive easement for purposes of ingress and egress." The land contract purchaser claimed he was entitled to use the easement strip for parking purposes. After reviewing the testimonial and other record evidence and the competing contentions of the parties, the Supreme Court declared the quoted language ambiguous and held that "the trial court properly permitted oral testimony to determine the true intent of the parties. See *McIntosh* v. *Groomes* (1924), 227 Mich 215," (discussed in footnote 5, *supra*) and affirmed the trial judge's denial of an injunction against the purchaser's use of the easement strip for parking purposes.