MAGEE v. BROWN.

1. CONTRACTS—RESTRAINT OF TRADE—SALE OF RETAIL BUSINESS—DEROGATION OF CONTRACT.

A seller of a retail business is not allowed to derogate from his own sale by destroying what he transferred or depreciating what he has sold.

2. SAME—SALE OF BUSINESS—SCOPE OF ACCOUNTING.

Defendants, who were engaged in the wholesale and retail hardware business, factory mill supply business, key making and manufacturing and sold the retail hardware business to plaintiff, were properly ordered to account to plaintiff for hardware sales at retail after the consummation of the transaction and to cease and desist in the sale of items of retail hardware and plaintiff properly decreed to have no right to an accounting as to the other operations.

3. WORDS AND PHRASES—WHOLESALE.

The word "wholesale," as used with respect to a business, is interpreted as the sale of commodities in large quantities to retailers, or jobbers, or large users of the items in the industrial or manufacturing field, rather than single items to persons not so engaged and the general public, irrespective of whether or not a sales tax is collected and irrespective of whether a sale is made at a reduced price.

4. SAME—MILL SUPPLIES.

The term "mill supplies" is interpreted as the sale of items to persons, firms or corporations in the industrial, manufacturing, processing, commercial or service field, irrespective of number of items involved, sales tax or reduced price.

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 36 Am Jur, Monopolies, Combinations, and Restraints of Trade § 62 et seq.

[2] 36 Am Jur, Monopolies, Combinations, and Restraints of Trade § 201.

[5] 36 Am Jur, Monopolies, Combinations, and Restraints of Trade § 202.

5. EQUITY—CLEAN HANDS—ACCOUNTING—INJUNCTION.
   Plaintiff in suit to enjoin defendants from conducting a retail
      hardware business contrary to their agreement of sale of such
      business to him within an area proscribed by agreements rela-
      tive to the transaction and for an accounting *held*, not to have
      been shown to come into court with unclean hands.

Appeal from Berrien; Arch (Charles O.), J., pre-
siding. Submitted October 12, 1956. (Docket No.
88, Calendar No. 46,386.) Decided February 28,
1957.

Bill by H. Ivan Magee against Clarence E. Brown
and Hertha Brown for injunction to restrain retail
sales of hardware by parties from whom he had pur-
chased business. Decree for plaintiff granting re-
lief in part but denying relief as to retail sales made
in connection with factory mill supply and manu-
facturing operations. Plaintiff appeals. Affirmed.

*Gore & Williams (Charles W. Gore,* of counsel),
for plaintiff.

*Small, Zick & Shaffer (Robert P. Small,* of coun-
sel), for defendants.

SMITH, J. This case involves the construction of
certain written instruments. There is almost no law
involved, save some general precepts, such as the one
that we construe an ambiguous instrument against
the draftsman, and so forth. The controversy arises
out of a covenant not to compete. It came up in this
way:

Plaintiff had been a traveling salesman, "selling
grocery items," for some 11 years. Desiring to enter
the hardware business ("I had always liked it") he
entered into negotiations for the purchase, from the
defendants, of the property here under considera-
tion. There seems to have been, on plaintiff's part, a

thorough exploration of the entire situation. As he says, "I had contact with Mr. Brown (defendant) 2 months while I was negotiating this purchase. I had full access to everything that was going on there." Mr. Brown agrees: "He had access to my place. I believe he lived with me about 2 months, I wouldn't say that for sure. He would go home during the week end but he was there during the week." Apparently plaintiff liked what he learned because he decided to purchase. A lawyer was retained and the various instruments about to be discussed drafted.

The documents employed were 4 in number, a written contract, sometimes referred to as the purchase agreement, providing for "purchase of merchandise" and "rent of store," a chattel mortgage, a bill of sale, and a lease. It should be noted, at this point, before entering upon a discussion of the content and meaning of the questioned clauses in these documents, that defendant Brown was not divesting himself of all of his business activities. At the time of the execution of these instruments he was engaged in the retail and wholesale hardware business, in factory mill supply, in manufacturing, in operating a tin shop, and in key making. What he sold to plaintiff, according to exhibit 3 (the bill of sale) was "all the entire stock of hardware merchandise described in an inventory and schedule hereto attached and made a part hereof." It should also be noted that plaintiff thus purchased only a part of the hardware merchandise. As the trial court found, the inventory made "appears to have been in a total sum beyond the resources available to plaintiff. Whereupon, further discussion took place, and it was agreed that some of the items might be eliminated and kept by the sellers, who are the defendants in this case."

At this point we have a situation pregnant with possibilities for controversy. The purchaser obvi-

ously wants the least possible amount of competition from the seller. Yet the seller is not closing out all of his enterprises, as the purchaser well knows. The parties themselves recognized the litigious possibilities in the situation they themselves were creating. The instruments were drawn and redrawn. There was frank discussion of the possible competitive situation, the parties differing only as to the precise words employed. Defendant Brown was asked at the trial: "You said to him (plaintiff), 'You and I are going to be in competition a while' "? "Not for a while," was the answer. "I said on certain items." Plaintiff Magee likewise recognized the situation. "I ask you (Magee)," we find in the record, "if that subject wasn't pretty thoroughly discussed between you and Mr. Brown during the negotiations which led up to this sale as to what items he would continue to sell in his mill or factory supply business? That was discussed at considerable length? A. It was discussed but I never could get an answer." We turn to the instruments themselves for an answer. Some reference to the problem is found in each.

We find in the purchase agreement a covenant not to compete phrased in the following terms:

"It is further agreed and understood, as a part of the consideration for said sale and lease, the seller shall not engage directly, or indirectly, in the retail hardware business in the city of Benton Harbor, or within a radius of 5 miles of said store during the term of said lease, or any renewal or extension thereof."

Similar language is found in the bill of sale:

"As a part of the consideration for this sale, the first parties expressly covenant and agree that they will not engage, directly or indirectly, in the retail hardware business in the city of Benton Harbor, or within a radius of 5 miles from the store located at

257 N. Fair avenue, Benton Harbor, Michigan, at any time during the term of the lease of said premises between said parties, or the successor or grantees of the parties of the first part and party of the second part."

These provisions, it will be noted, speak of the "retail hardware business." What of the other businesses, the wholesale, the factory supply, and so forth? Again we turn to the purchase agreement. We find provided therein that:

"It is further understood that said premises are to be used for retail mercantile purposes only, and that the seller shall have the right to continue his wholesale, factory supply, and manufacturing operations on the rear of said premises."

In the lease we find similar provisions, it stating, in part:

"It is further understood and agreed that said premises are to be used for mercantile purposes only, and that the first parties shall have the right to continue wholesale and factory mill supply and manufacturing operations only on said premises and tin shop and key-making."

And, finally, in the chattel mortgage we find the following:

"No goods, covered by this mortgage, shall be sold by said party of the first part, except in the ordinary course of wholesale and retail trade, and then only for cash, or to responsible persons and on short time."

And,

"Party of the first part may possess, sell, use, and enjoy in the usual and regular manner of wholesale and retail trade, without any disturbance or interference by said parties of the second part, all the said property covered by this mortgage."

It is the claim of the plaintiff that defendants have openly and flagrantly violated their agreement in that they "have engaged in the sale of hardware by retail and have sold to various and sundry persons and to the public generally" and that they "are now in open and notorious competition with the plaintiff in selling hardware and other merchandise by retail." Plaintiff further asserts that defendants' acts and conduct have caused him irreparable loss and damage and asks injunctive relief and for an accounting. Defendants, for their part, admit that they are bound by their agreement not to engage in the retail hardware business. They state that they "do not claim the right to engage in the retail hardware business." But they assert that what they have done comes not only within the letter but within the spirit of the agreements made, in that they have merely continued the operation of the business not included within the covenant not to compete. The trial court summarizes defendants' testimony in these terms:

"Defendants testify that they were carrying on a wholesale hardware business at the time of the sale, and that this was well known to the purchaser, and that it was specifically agreed that they would have the right to continue this mercantile operation. They explain further that their factory mill supply business was as well known to the purchaser and that he had ample opportunity to know about their tin shop and manufacturing projects and their extensive key-making business, and that each of these various activities included sales at retail, except, of course, their wholesale hardware business."

After taking considerable testimony on the conduct of the business involved, the trial court concluded that both parties had been somewhat at fault. The defendants, it concluded, who had agreed that they would not engage in the retail hardware busi-

ness, either "directly or indirectly," were "using a backdoor entrance to try to bring these various retail hardware sales under the exempt operations of the agreement. This, they should not be permitted to do." With this finding and conclusion we are in complete agreement.

There is no doubt, as appellant urges, that a seller is not allowed to derogate from his own sale. "He is not at liberty to destroy what he transferred or depreciate what he sold." *Colton* v. *Duvall*, 254 Mich 346, 350. But the statement of the principle merely brings us to the issue, not to the solution, for the more difficult questions relate to the meaning and content of the terms "wholesale business," "factory mill supply business," "manufacturing operations," and similar phrases descriptive of the exempted operations. May, for instance, the products of the "manufacturing operations" be sold at retail as well as at wholesale? Or, since a homeowner may purchase for his private use the same type of screwdriver purchased by a factory owner for use in the plant, which, if any, of such sales were permitted to defendants (as sales of factory supplies) under the terms of the agreement and which were prohibited by reason of being sales at retail?

With respect to these and related issues the trial court took extensive testimony, "made a number of pages of longhand notes as the trial progressed," "studied over the pleadings very carefully," and called for and obtained briefs at the end of the trial. After careful study in this Court, and a review of the testimony offered, we are impressed that we cannot improve upon either the accuracy or the lucidity of the opinion thereupon rendered, which we adopt as our own. The trial court held as follows:

"There is no question in the court's mind but what the exempted operations of defendant should be

carried on without hindrance and without benefit to the plaintiff; namely, their wholesale business, their factory mill supply business, their manufacturing operations and their key-making business, and it is found that plaintiff has no interest in the proceeds from any of these activities whatsoever, and defendants shall not be required to account to him for any such operations. The court further finds that as far as these operations are concerned they are entitled to sell any of their manufactured products at retail as well as wholesale, and by this the court has in mind their catalogue which was offered in evidence and which includes the items of so-called camp stoves in which the fronts are cast at a foundry and shipped to defendants and assembled by them in connection with their sheet metal work; any sheet metal work which they may turn out as a result of the operations of their plant; any of the poisonous materials which they are offering to the trade, and boat hardware which is being manufactured for them, as well as key cutting. On the other hand, they are to cease and desist in the sale of any items of retail hardware other than those items, and shall account to plaintiff for those which they have sold since the consummation of their transaction.

"Considerable testimony was offered as to what was the meaning of wholesale and retail, and for the purpose of determining that issue the court finds that the word 'wholesale' shall be interpreted as follows:

"The sale of commodities in large quantities to retailers, or jobbers, or large users of said items in the industrial or manufacturing field, rather than single items to persons not so engaged and the general public up and down the street. Whether or not sales tax is collected is not necessarily a conclusive criteria because in the industrial field if wholesale items were used in maintenance work about the plant, then sales tax should be properly collected, but if the same items were used in the processing program of that plant, then it is not understood that

they would be liable for the payment of a sales tax thereon. Also, the sale at a reduced price shall not be considered as wholesale for that reason alone.

"Also, for the purpose of this opinion the court finds that the words 'mill supplies' mean the following, to-wit: the sale of items to persons, firms or corporations in the industrial, manufacturing, processing, commercial or service field as distinguished from one not so engaged, and which might not come within the meaning of 'wholesale' because items of mill supplies might not necessarily be bought in large quantities. In fact, a person or firm might purchase a single item under this ruling and it would still be exempt because it was in fact a mill supply as herein defined, and again, the question of whether or not sales tax was collected on the sale, or whether or not it was sold at a reduced price would not be the conclusive rule by which it would be measured.

"Thus, it will be seen that each item which may be subject to an accounting must be traced to its ultimate consumer and use, and it shall be determined from those sources whether or not it was sold in retail or wholesale trade or as a mill supply in accordance with the above rules as outlined by the court in this opinion, rather than to say that certain items themselves are retail items, or mill-supply items, or sold in wholesale trade, as it at once becomes apparent that many of the items might be either and that they are ofttimes interlapping and overlapping and are sold by some houses who handle both factory or mill supplies and wholesale supplies from the same stock of merchandise.

"As this court is without facilities to come to Berrien county to preside at a public trial for the period of time necessary to review the books of defendants, trace out these various items and prepare a statement covering them, the total thereof and the net profit thereon, an order may enter referring that determination to a circuit court commissioner of Berrien county, Michigan, who will take the testi-

mony and report it back to the court, which will then render a judgment in a proper amount thereof, and should any of the items reported by the commissioner be questioned by either party with reference to whether or not they are retail, or for any other reason, this court will come to Berrien county and hear any testimony or argument on those matters, and will reserve the right to pass upon them thereafter.

"A decree may enter in accordance with this opinion, and as it is a final order and appealable, it is suggested that the matter not be referred to a commissioner until the period for appeal has expired in order that it may be reviewed should the parties, or either of them, so desire, before the burden of undertaking the determination and assessment of damages.

"The court is not prepared to go as far as counsel for defendants suggest, either in dismissing the bill because of the failure of the proof, or for the reason that plaintiff comes into court with unclean hands. Defendants sought no damages from plaintiff in their pleadings, and have made no complaint thereof until the matter came up in open court at the trial on the merits, and while it is apparent that plaintiff somewhat exceeded his rights under the agreement between the parties, yet it is not felt that it was offensive to the point that the case should be dismissed under that well-known rule of equity that he who comes into court with unclean hands shall not be permitted to be heard."

Affirmed. Costs to appellees.

DETHMERS, C. J., and SHARPE, EDWARDS, KELLY, CARR, and BLACK, JJ., concurred.

VOELKER, J., took no part in the decision of this case.