**In re Robert Cecil SPRADLIN, Debtor.**

No. 98–20611.

United States Bankruptcy Court,
E.D. Michigan,
Northern Division.

March 18, 2002.

Donald F. Baty, Jr., David B. Cade, Andrew S. Doctoroff, Honigman, Miller, Schwartz and Cohn LLP, Michael C. Hammer, Ralph E. McDowell, Detroit, MI, Howard S. Sher, Troy, MI, for creditors.

Susan M. Cook, Bay City, MI, Donald J. Hutchinson, Detroit, MI, Andrew J. Munro, Troy, MI, for debtors.

Daniel C. Himmelspach, Saginaw, MI, George E. Jacobs, Bay City, MI, for trustees.

## *OPINION REGARDING VALIDITY OF NONCOMPETITION AGREEMENT*

ARTHUR J. SPECTOR, Chief Judge.

### Introduction

Facts pertinent to this contested matter are set forth in an opinion of the Court

issued in an adversary proceeding involving the same parties.

1. Robert C. Spradlin was the sole or controlling shareholder in two companies, Contract Interiors, Inc., and Contract Interiors of Ohio, Inc.

2. These companies operated in Michigan and Ohio as dealerships of office furniture manufactured by Steelcase, Inc.

3. The dealerships defaulted on various obligations held by Steelcase Financial Services, Inc. ("SFSI").

4. Some of these obligations were personally guaranteed by Spradlin.

5. On October 28, 1996, Spradlin and the dealerships entered into a "Surrender and Settlement Agreement" with Steelcase, SFSI, and Lakestates Workplace Solutions, Inc. [ (These latter 3 companies will be referred to collectively as the "Steelcase Parties.") ]

. . . .

6. Under the terms of the foregoing agreement, Spradlin and the dealerships surrendered to SFSI assets securing the unpaid obligations and SFSI accepted the collateral in satisfaction of those obligations. . . .

7. By way of separate agreement, SFSI was to convey to Lakestates the assets acquired from Spradlin and the dealerships. . . .

8. On October 28, 1996, the parties identified in ¶ 5 above also signed a "Noncompetition Agreement." [ (hereafter, the "NCA") ] . . .

9. Pursuant to the . . . [NCA], Spradlin and the dealerships agreed that they would "not compete, directly or indirectly, in any manner with [Lakestates] . . . in any part of [Michigan or Ohio] . . . in the contract office and commercial furniture businesses." . . . [NCA] at ¶ 1A

(internal quotation marks deleted). [ (Exhibit C of Spradlin's Brief) ]

10. The agreement not to compete was to run for a period of five years, commencing from the date the . . . [NCA] was executed. *Id.*

11. The following consideration was to be paid by the Steelcase Parties in exchange for the covenants set forth in the . . . [NCA]: (i) $900,000 and $100,000 to the dealerships and Spradlin, respectively, upon execution of the . . . [NCA]; and (ii) $500,000 to the dealerships on October 28, 2001. *Id.* at ¶ 3.

. . .

13. In June of 1997, Lakestates' interest in the . . . [NCA], along with other Lakestates assets, was purchased by The Holland Group, L.L.C. [ ("Holland") ] . . .

14. On March 13, 1998, Spradlin filed a petition for relief under title 11 of the United States Code. The case is currently pending under chapter 7 of the Bankruptcy Code.

*Lakestates Workplace Solutions, Inc. v. Spradlin,* A.P. No. 98–2065, slip opinion at 2–4 (Bankr.E.D. Mich. May 15, 2000); *aff'd* No. 00–CV–72649 (E.D.Mich. Jan. 5, 2001).

The Steelcase Parties and Holland (collectively, the "Creditors") filed a proof of claim based in part upon breach of the NCA. Spradlin, against whom the Creditors have a pending action seeking denial of discharge pursuant to various provisions under 11 U.S.C. § 727(a), objected to allowance of the claim. *See generally, e.g., In re Willard,* 240 B.R. 664, 668 (Bankr. D.Conn.1999) ("While in a Chapter 7 case a debtor typically lacks standing to object to claims because the debtor is not aggrieved, . . . [an exception is] recognized . . . where the claim involved may not be discharged."); *cf. In re Dow Corning Corp.,* 270 B.R. 393, 399 (Bankr.E.D.Mich. 2001) ("Disallowance pursuant to [11

U.S.C. § 502(b)(1) ] ... might very well bar the claim-holder from attempting to enforce the claim in subsequent proceedings against the debtor."). Each side has filed a motion for partial summary judgment based solely on the breach-of-contract issue. A hearing on the motions was held, and the Court took the matter under advisement.

## Discussion

A claim against the bankruptcy estate must be disallowed "to the extent that ... [it] is unenforceable against the debtor ... under ... applicable law." 11 U.S.C. § 502(b)(1). The parties agree that Michigan provides the "applicable law" for purposes of determining whether the NCA is enforceable. *See* NCA at ¶ 11("This Agreement shall be governed by ... the laws of the State of Michigan...."). They also agree that this determination can be made in the context of a motion for summary judgment. But of course they disagree as to what the determination should be: The Creditors contend that the NCA is enforceable, while Spradlin argues that it is not.

In addition to the common issue of enforceability, each side claims a right to summary judgment with respect to a separate issue. Spradlin argues that the Steelcase Parties lack standing to seek damages for breach of the NCA, while the Creditors assert that such damages amount to at least $100,000. The Court will consider these subsidiary issues before addressing the larger question of the NCA's validity.

### (i) Standing

■ There are "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). Prudential standing is based on the principle "that the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties." *Id.* at 499, 95 S.Ct. 2197. *Cf.* F.R.Civ.P. 17(a) ("Every action shall be prosecuted in the name of the real party in interest." [1]).

■ It was never disputed that Lakestates assigned its interests under the NCA to Holland, and the Court so found in prior litigation. Thus the Court agrees with Spradlin that Lakestates lacks prudential standing to enforce the NCA.

■ With regard to Steelcase and SFSI, the Creditors point out that these entities were also parties to the NCA, and that neither of them assigned its rights thereunder. The problem with this argument is that Steelcase and SFSI essentially had no rights to assign.

As indicated earlier, the consideration for Spradlin's covenant not to compete was to be paid by Steelcase and SFSI (along with Lakestates). *See* NCA at ¶ 3. But the covenant itself precludes competition only with Lakestates. *See id.* at ¶ 1 A. The NCA also provides:

4. **Remedies.** ... [Spradlin and the dealerships] expressly acknowledge that, because of the unique nature of the covenants set forth in this Agreement, it would be impossible to measure in money the damages suffered if [they] ... were to fail to comply with any of the obligations imposed by this Agreement and that, if [they] ... fail to comply with this Agreement, [Lakestates] ... shall be irreparably damaged and will not have an adequate remedy at law. Accordingly, the parties agree that, in addition to withholding all remaining

---

1. This rule automatically applies to adversary proceedings, but would be applicable to this contested matter only if the Court so ordered. *See* F.R.Bankr.P. 7017, 9014.

payments owed to [Spradlin and the dealerships] . . . under this Agreement and any other remedy to which [Lakestates] . . . may be entitled, [Lakestates] . . . shall be entitled to injunctive and other equitable relief with respect to a breach of this Agreement by [Spradlin and the dealerships] . . . and to specifically enforce the provisions of this Agreement. . . .

. . .

6. **Binding Effect and Benefits.** This Agreement shall be binding upon, inure to the benefit of, and be enforceable by and against the heirs and legal representatives, successors and assigns of [Spradlin and the dealerships] . . . and the successors and assigns of . . . [Lakestates]. *Nothing in this Agreement, express or implied, is intended to confer upon any other person any rights or remedies under or by reason of this Agreement except as expressly stated in this Agreement.*

7. **Amendments and Waivers.** This Agreement may be amended, modified, superseded, or canceled, and any of the terms of this Agreement may be waived, only by a written instrument signed by . . . [Spradlin and the dealerships] and . . . [Lakestates] and approved by . . . [Lakestates'] Board of Directors. The failure of . . . [Lakestates] at any time to require performance of any provision of this Agreement shall not affect the right of . . . [Lakestates] at a later time to enforce that or any other provision. . . .

*Id.* at ¶¶ 4, 6 & 7 (emphasis added).

These provisions suggest that Steelcase and SFSI have the right to withhold the $500,000 lump-sum payment owed to Spradlin's dealerships in the event of a breach. *See id.* at ¶¶ 3 & 4. But this right is irrelevant: Spradlin is not seeking such payment, nor are Steelcase/SFSI seeking a

declaration that they are absolved of that liability.

The question raised by the standing argument is whether the NCA gives Steelcase/SFSI the right to recover damages should Spradlin violate the covenant not to compete. The portions of the NCA quoted above indicate quite clearly that this right vested solely in Lakestates.

For these reasons, we conclude that Steelcase/SFSI have no contractual right to recover damages for breach of the NCA. As stated earlier, Lakestates no longer has such a right. Spradlin's motion will therefore be granted insofar as it seeks a ruling that the Steelcase Parties lack prudential standing to prosecute this action.

**(ii) Damages**

■ Spradlin acknowledges that he violated the covenant not to compete. *See* Spradlin Response at ¶ 5A. The Creditors argue that in compensation for this breach, Spradlin "must return the $100,000 paid to him . . . in exchange for his entering into the agreement." Creditors' Brief in Opposition at p. 9. Spradlin counters that if the Court were to rule that the NCA is enforceable and that "one or more of the [Creditors] . . . was damaged by" its breach, he would "agree[ ] . . . that payment of the $100,000.00 . . . would be an accurate value to place on this aspect of the . . . [Creditors'] claim." Spradlin's Response at ¶ 8.

However, the sides are not as close on this issue as the foregoing comments suggest. For one thing, the Creditors reserve the right to seek damages in excess of $100,000. *See* Creditors' Brief at p. 9 n. 11 ("There still exists a question of fact as to the **extent** of the damages suffered by . . . [the Creditors] on account of Spradlin's breaching the . . . [NCA], that is[,] the damages above and beyond the $100,000

given to him. Thus, [the Creditors] ... are not requesting summary judgment as to this portion of their claim as to the ... [NCA].").

More importantly, Spradlin is not conceding that the Creditors were in fact damaged by the breach. Thus the question here is whether there is a "genuine issue" concerning the extent of damages incurred by Holland (or Lakestates, as Holland's predecessor in interest). F.R.Civ.P. 56(c) (incorporated by F.R.Bankr.P. 7056 & 9014).

That question must be answered in the affirmative. This Court previously opined that, "absent evidence to the contrary, it seems reasonable to assume that a promise not to compete is worth roughly what sophisticated business people agreed it was worth." *Lakestates*, slip op. at 12 n. 7. But here there is "evidence to the contrary," albeit in the form of negative inferences. First, the fact that the Creditors have not disclosed what consideration Holland paid to Lakestates suggests that the latter party received less than $100,000 for the assignment. This, in turn, suggests that the Steelcase parties originally overestimated the value of the covenant not to compete.

Second, the Creditors did not submit evidence of damages based on sales projections or loss of market share. *See id.* at pp. 11–12. This unexplained omission suggests that such evidence would be favorable to Spradlin. *See generally, e.g., Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1020 (6th Cir.2000) (The court "must view the entire record in a light most favorable to the

party opposing summary judgment, and draw all reasonable inferences in that party's favor."); *In re Crabtree*, 39 B.R. 718, 724 (Bankr.E.D.Tenn.1984) ("When a party has exclusive knowledge of facts and fails to testify to them ..., a negative inference can be drawn against the party.").

The Creditors offer no evidence that Holland was harmed by Spradlin's breach of the covenant. In this respect, then, their motion will be denied.

### (iii) Enforceability

The logical starting point in assessing the NCA's validity is the Michigan Antitrust Reform Act ("MARA"), Mich. Comp. Laws § 445.771 *et seq.* Section 2 of MARA states that "[a] contract ... between 2 or more persons in restraint of ... trade or commerce in a relevant market is unlawful." Mich. Comp. Laws § 445.772. *See also* Mich. Comp. Laws § 445.771(a) (" 'Person' means an individual, corporation, ... or any other legal entity."). The Creditors implicitly concede, and we agree, that non-compete agreements fall within the reach of § 2.[2] *See* Mich. Comp. Laws § 445.771(b) (This provision defines "[r]elevant market," a term used in MARA § 2, as "mean[ing] the geographical area of actual or potential *competition* in a line of trade or commerce." (emphasis added)); *Stoia v. Miskinis*, 298 Mich. 105, 117–18, 298 N.W. 469 (1941) ("Any ... contract which purports to limit in any way the right of either party to work or to do business ... may be called a ... contract in restraint of trade." (citation omitted)); *Compton v. Jo-*

---

**2.** Support for this conclusion lies is the fact that as originally enacted, MARA contained no provision which specifically addressed non-compete agreements. (Section 4a, which governs employment-based noncompetition agreements was not enacted until more than two years after MARA became law.) Since

pre-MARA statutory law explicitly prohibited non-compete agreements, *see* Mich. Comp. Law § 445.761 (repealed by MARA), it is unlikely that the legislature contemplated that such agreements were outside the purview of § 2.

*seph Lepak, DDS, PC,* 154 Mich.App. 360, 365–69, 397 N.W.2d 311 (1986) (assuming without discussion that MARA § 2 encompasses non-compete agreements); *see also* Restatement, Second, Contracts § 186(2) ("A promise is in restraint of trade if its performance would limit competition in any business or restrict the promisor in the exercise of a gainful occupation.").

The Creditors argue, however, that § 2 prohibits only those contracts which *unreasonably* restrain trade. *See* Creditors' Brief at p. 19. Spradlin does not dispute this assertion, and it finds support in a decision of the Michigan Court of Appeals. *See Compton,* 154 Mich.App. at 366, 397 N.W.2d 311. The Court is bound by *Compton's* construction of § 2 "absent a strong showing that the state's ... [Supreme C]ourt would decide the issue differently." *In re Akron–Cleveland Auto Rental,* 921 F.2d 659, 662 (6th Cir.1990).

There is no sound basis for concluding that *Compton* would be reversed on this point. To the contrary, all indications are that *Compton* is correct. As noted by that court, a comment to the uniform law which served as the model for MARA states that section 2 "gathers together and proscribes all concerted or collusive conduct in *unreasonable* restraint of trade, as under the common law and section 1 of the Sherman Act[, 15 U.S.C. § 1]." Uniform State Antitrust Act Comment foll. Mich. Comp. Laws Ann. § 445.772 (emphasis added). *See also* Mich. Comp. Laws § 445.784(2) ("It is the intent of the legislature that in construing all sections of this act, the courts shall give due deference to interpretations given by the federal courts to comparable antitrust statutes, including ... the rule of reason."); *compare* 15 U.S.C. § 1 ("Every contract ... in restraint of trade or commerce among the several States is ... illegal.") *with State Oil Co. v. Khan,* 522 U.S. 3, 10, 118 S.Ct. 275, 139 L.Ed.2d 199 (1997) ("Although the Sherman Act, by its terms, prohibits every agreement 'in restraint of trade,' this Court has long recognized that Congress intended to outlaw only unreasonable restraints.... As a consequence, most antitrust claims are analyzed under a 'rule of reason,' according to which the finder of fact must decide whether the questioned practice imposes an unreasonable restraint on competition....").

The Supreme Court's limiting construction of the Sherman Act was based in part on the fact that, prior to enactment of that legislation, the reasonable restraint of trade was permitted under common law. *See National Soc'y of Prof'l Eng'rs v. United States,* 435 U.S. 679, 688, 98 S.Ct. 1355, 55 L.Ed.2d 637 (1978). Similarly, Michigan statutory law allowed for certain trade restraints prior to enactment of MARA. *See* Mich. Comp. Laws § 445.731 (repealed by MARA; quoted *infra* p. 710); Mich. Comp. Laws § 445.766 (repealed by MARA; quoted *infra* p. 711). Moreover, pre-MARA Michigan common law countenanced reasonable trade restraints. *See Hubbard v. Miller,* 27 Mich. 15, 19–21 (1873).

Given these parallels, and the fact that MARA was patterned after the Sherman Act, the Michigan Supreme Court would probably affirm *Compton.* Thus the Court concludes that MARA § 2 applies only to unreasonable trade restraints. *See Perceptron, Inc. v. Sensor Adaptive Machs.,* 221 F.3d 913, 919 n. 6 (6th Cir. 2000) (citing *Compton* for the proposition that MARA "adopted language from and is interpreted consistent with the Sherman Act").

As indicated, Spradlin did not argue that § 2 of MARA prohibits even reasonable trade-restraining contracts. He does argue, however, that the NCA is unenforcea-

ble. He bases this argument on two theories.

### The Negative–Inference Theory

Section 4a of MARA states:

An employer may obtain from an employee an agreement ... which protects an employer's reasonable competitive business interests and expressly prohibits an employee from engaging in employment or a line of business after termination of employment if the agreement ... is reasonable as to its duration, geographical area, and the type of employment or line of business....

Mich. Comp. Laws § 445.774a(1). According to Spradlin, this provision gives rise to a negative inference—namely, that noncompete agreements other than those between employer and employee are invalid. He finds support for this theory in MARA's preamble, which describes MARA as an act "to prohibit contracts ... in restraint of trade or commerce ... [and] **to allow certain agreements not to compete.**" Spradlin's Brief at p. 11 (quoting the preamble; emphasis supplied by Spradlin).

The Creditors dispute Spradlin's broad interpretation of § 4a. They argue that this provision simply addresses a subspecies of contracts—those involving an employment relationship—and does not purport to speak to the validity of non-compete agreements which lack that relationship.

Spradlin's argument would be persuasive if we were convinced that § 4a was in fact designed to identify non-compete agreements which are excepted from § 2's reach. Cf. *Bradley v. Bd. of Educ. Saranac Cmty. Schools*, 455 Mich. 285, 298–99, 565 N.W.2d 650 (1997) (applying "the maxim *expressio unius est exclusio alterius;* ... [i.e.,] the express mention in a statute of one thing implies the exclusion of other similar things," in ruling that a statutory exemption from disclosure under Michigan's Freedom of Information Act for "the personnel records of law enforcement agencies" compelled "the conclusion that the Legislature rejected the opportunity to extend th[e] exemption to other public employees"). But we are not so convinced.

The problem with reading § 4a as carving out an exception to § 2 is that the latter statute, by virtue of its judicial gloss, already contains a major exception—that being for contractual restraints which are "reasonable." This implicit exception is significant for two reasons. First, it accounts for the preamble language cited by Spradlin, and does so more persuasively than § 4a—a provision which was not originally included in MARA.

The second and more important reason stems from the fact that § 4a also imposes a requirement of reasonableness (this one explicitly stated). Since both provisions permit reasonable non-compete agreements, it is conceptually awkward to describe § 4a as legitimizing agreements that would otherwise be invalid pursuant to § 2.

■ A more plausible interpretation of §§ 2 and 4a is that the latter simply refines the former's reasonableness requirement, specifying in greater detail the standard by which compliance with that requirement is to be measured. So understood, § 4a says nothing about the validity of non-compete agreements other than those between employer and employee. To the contrary, all that one can fairly infer from § 4a is that the legislature has thus far declined to elaborate on the reasonableness standard insofar as it pertains to non-employment agreements.

There is another consideration which points to the same conclusion. In Michigan and elsewhere, courts have shown greater hostility toward non-compete

agreements of the employer/employee variety than they have toward such agreements when executed in conjunction with the sale of a business. As Justice Williams explained:

> The greater deference granted a covenant not to compete incident to a sale of a business is rooted primarily in the recognition of the substantially equal bargaining power of freely contracting parties in such cases.
>
> . . .
>
> Moreover, there must be some form of restraint on the transferor of good will in order for the transferee to get the full value of what is being acquired.
>
> . . .
>
> > "The average, individual employee has little but his labor to sell or to use to make a living. He is often in urgent need of selling it and in no position to object to boiler plate restrictive covenants placed before him to sign."

*Woodward v. Cadillac Overall Supply Co.*, 396 Mich. 379, 392–93, 240 N.W.2d 710 (Williams, J., dissenting;[3] citation and footnotes omitted); *see also Bryan v. Lincare, Inc.*, No. 99–74625, 2000 WL 156821, at *2 (E.D.Mich. Jan.20, 2000) (unpublished) ("Even during the era when Michigan courts routinely struck employee covenants as contrary to public policy, covenants executed in connection with the sale of a business were found enforceable."); I. Alterman, *Trade Regulation in Michigan: Covenants Not To Compete*, 23 Wayne L.Rev. 275, 276 (1977) ("Michigan enacted a statute governing restrictive covenants in 1905 . . . . This statutory provision had a profound impact on employee covenants, making them completely unlawful until a limited exception was enacted. . . . The statute has had no . . . material impact on sale of business restrictions."); *id.* at 286 (asserting that under (pre-MARA) Michigan law, "employee covenants are void, with one minor exception"); *id.* at 292 ("Employee covenants have been subject to stricter scrutiny" than have "covenants in the sale of a business."); Restatement, Second, Contracts § 188, Comment "b" ("[C]ourts have generally been more willing to uphold promises to refrain from competition made in connection with sales of good will than those made in connection with contracts of employment."); *id.,* Comment "g" ("Post-employment restraints are scrutinized with particular care because they are often the product of unequal bargaining power and because the employee is likely to give scant attention to the hardship he may later suffer through loss of his livelihood.").

Given this longstanding antipathy toward employment-related non-compete agreements, § 4a can be understood as a responsive measure taken by the legislature to counterbalance that bias. But if one were to accept Spradlin's reading of § 4a, then the bias would be reversed: Employers could obtain enforceable non-compete pledges, yet business vendees could not. Such a construction of MARA is inappropriate, as there is no clear indication that it comports with legislative intent. *See generally Nation v. W D E Elec. Co.*, 454 Mich. 489, 494, 563 N.W.2d 233 (1997) ("[S]tatutes in derogation of the common law must be strictly construed, and . . . [are] to be given the effect which makes the least rather than the most change in the common law." (citations and internal quotation marks omitted)); *B & B*

---

**3.** Chief Justice Kavanagh concurred with Justice Williams. *See Woodward,* 396 Mich. at 407, 240 N.W.2d 710. Two of the seven justices took no part in deciding the case. *See id.* at 384, 240 N.W.2d 710. The majority did not take issue with the excerpted portion of Justice Williams's remarks.

*Inv. Group v. Gitler,* 229 Mich.App. 1, 7, 581 N.W.2d 17 (1998) (per curiam) ("Well-settled common-law principles are not to be abolished by implication, and when an ambiguous statute contravenes common law, it must be interpreted so that it makes the least change in the common law.").

For these reasons, the Court concludes that MARA § 4a does not preclude vendors from executing a valid non-compete agreement.

*The Goodwill Theory*

■ Spradlin argues that even if a vendor's non-compete agreement is potentially enforceable, goodwill must be included among the assets sold. Since "[t]he undisputed facts ... show conclusively that there was no sale of good will in connection with the" NCA, his argument continues, the NCA "is unenforceable." Spradlin's Brief at pp. 18–19.

The Creditors do not take issue with the contention, directly supported by the deposition testimony of William Geiger, *see* Exhibit E of Spradlin's Brief at pp. 69–71, that the Steelcase Parties did not purchase goodwill from Spradlin and the dealerships. The Court therefore assumes that this contention is correct—notwithstanding contractual provisions which suggest otherwise. *See, e.g.,* NCA at p. 1 (indicating that a purpose of the NCA is "to protect and preserve the business and goodwill associated with the assets foreclosed upon and acquired by" Lakestates); Surrender and Settlement Agreement (Exhibit B of Spradlin's Brief) at ¶ 12 (generally requiring Spradlin and his dealerships to cooperate with the Steelcase Parties in matters relating to the dealerships' existing customer base). The issue, then, is whether the non-inclusion of goodwill in the Surrender and Settlement Agreement dooms the NCA.

Pre–MARA statutory law, and the cases construing that law, support Spradlin on this point. Consider former § 445.731, which stated:

> [A]ll contracts ..., the purpose or intent of which is to prohibit, restrict, limit, control or regulate the sale of any article of machinery, tools, implements, vehicles or appliances designed to be used in any branch of productive industry; or to enhance or control or regulate the price thereof; or in any manner to restrict, limit ... [,] regulate or destroy free and unlimited competition in the sale thereof, shall be deemed illegal and void as in restraint of trade: Provided, That *nothing in this act shall be construed to impair or invalidate ... contracts* known to the common law and in equity as those *relating to good will of trade.*

Mich. Comp. Laws § 445.731 (repealed by MARA; *quoted in State of Michigan v. Detroit Lumbermen's Ass'n,* No. 79 904761, 1979 WL 18703, at *1 (Mich.Cir.Ct. Oct.29, 1979) (unpublished; emphasis added)). By negative inference, former § 445.731 indicates that trade restraints other than those imposed on the vendor of goodwill are invalid.

Under the rather confusing pre-MARA statutory scheme, there was a provision relating more specifically to non-compete agreements. Pursuant to former § 445.761, "contracts by which any person ... agree[d] not to engage in any avocation, employment, pursuit, trade, profession or business" were "declared ... void." Mich. Comp. Laws § 445.761 (repealed by MARA; *quoted in Cardiology Assocs. of Southwestern Michigan v. Zencka,* 155 Mich.App. 632, 636, 400 N.W.2d 606 (1985) (per curiam)). Former § 445.766 carved out exceptions to this general ban:

> *This act shall not apply to any contract ... where the only object of restraint imposed by the contract is to protect the*

*vendee ... of a trade pursuit, avocation, profession or business, or the good will thereof,* sold ... for a valuable consideration ...; nor to any contract of employment under which the employer furnishes or discloses to the employee a list of customers ... within certain territory in which such employee is to work, in which contract the employee agrees not to perform similar services in such territory ... in a like or competing line of business for a period of ninety ... days after the termination of such contract....

Mich. Comp. Laws § 445.766 (repealed by MARA; *quoted in Lansing–Lewis Servs. v. Schmitt,* 188 Mich.App. 647, 652–53, 470 N.W.2d 405 (1990) (per curiam) (emphasis added)). The highlighted portion of former § 445.766, particularly when read in conjunction with the highlighted portion of former § 445.731, strongly supports the conclusion that a vendee could not obtain a valid non-compete pledge from the vendor unless goodwill was purchased. And it appears that courts reached the same conclusion in construing these statutes. *See Bernstein, Bernstein, Wile & Gordon v. Ross,* 22 Mich.App. 117, 123, 177 N.W.2d 193 (1970) ("The statutes do not favor covenants not to compete except where a business or profession is sold, including its good will."); *see also Zencka,* 155 Mich. App. at 639, 400 N.W.2d 606 (interpreting a prior decision of the court as having declined to enforce a non-compete covenant that "did not come within the statutory exception because no sale of good will occurred").

Of course, we are now dealing with MARA, not former §§ 445.731 and 445.766. In stark contrast to the latter statutes, MARA contains no language which explicitly supports the proposition that a vendor is bound by the non-compete agreement only if goodwill was sold. Rather, the sole requirement under MARA § 2 is that such an agreement be "reasonable."

However, goodwill has long been viewed as relevant to the issue of reasonableness. The Supreme Court's decision in *Hubbard* illustrates this point. The plaintiff in that case purchased well-drilling equipment from the defendants, and obtained a promise on their part not to compete with him in that line of work. *Hubbard,* 27 Mich. at 15–17. The defendants argued "that the only consideration paid" by the plaintiff was "the cost price of the goods" sold, and that "this ... [was] not sufficient to support the restraint contracted for." *Id.* at 18. The court rejected this argument, declaring that "[w]here a consideration recognized by law as being valuable is paid, the law very properly allows the parties to judge for themselves of the sufficiency in value of such consideration for their contracts." *Id.* at 20.

The following comments from *Hubbard* are of particular relevance to the case at bar:

[A]ll contracts in restraint of trade are void, if considered only in the *abstract,* and without reference to the situation or objects of the parties or other circumstances under or with reference to which they were made [ (emphasis in original) ]; and this, though the pecuniary consideration paid may have been sufficient ...; or even though it may be sufficient in value to compensate the restraint imposed. But if, considered with reference to the situation, business and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interests of the party in whose favor it is imposed, reasonable as

between them and not specially injurious to the public, the restraint will be held valid. A contract of this kind requires no greater pecuniary or valuable consideration to support it than any other contract; but such consideration, however valuable, will not of itself support it. Whether it can be supported or not, depends upon matters outside of and beyond the abstract fact of the contract or the pecuniary consideration; it will depend upon the situation of the parties, the nature of their business, the interests to be protected by the restriction, its effect upon the public; in short upon all the surrounding circumstances; ... *if reasonable and just, the restriction will be sustained, if not, it will be held void.* To illustrate ... by a single example: If A, who is not engaged in the business of keeping a public house, ... and does not contemplate entering upon or being interested in such business, goes to B, who is engaged, or preparing and about to engage, in such business, and takes a contract from B not to continue or engage in such business in a particular city ..., such a restriction would be void, whatever pecuniary consideration might be paid for it. A can have no legal interest in, and can derive no benefit from, such a restraint, and has no legal interest in its observance; and it would be imposing a restriction on B which might be burdensome to him without any corresponding benefit. *It would, therefore, be wholly unreasonable* and void. But, on the other hand, if A, being already engaged, or about to engage in any such business, should purchase out the stock and business of B, or any particular branch of it with the stock pertaining thereto, on the condition or upon the terms that B should not further carry on that business, or the particular branch of it, within the town where located ... and B should thus

contract, *this restraint under such circumstances would be fair and just and reasonable* between the parties, one of whom gives what, without such restraint he would not have given, and the restraint contracted for being an essential consideration, without which the vendor could not have made the sale for the price received, and the purchaser would not have bought; and such restraint being a benefit to the purchaser and not specially injurious to the public,-as every other person except the vendor is still at liberty to engage in the same business within the same limits; *such a restraint,* under such circumstances, *would be fair, reasonable and valid,* and would be enforced like any other valid, contract.

*Id.* at 18–20 (emphasis added, except where otherwise noted).

Thus *Hubbard* indicates that an appropriate consideration in assessing reasonableness is whether the non-compete agreement subserves another transaction between the parties to that agreement; in other words, whether the agreement represents an "ancillary" restraint. *See Boggs v. Couturier,* 115 Mich.App. 735, 739, 321 N.W.2d 794 (1982) ("At common law a covenant not to compete was void if it was a 'naked' restraint, but it could be lawful if it was an ancillary covenant, *i.e.,* connected to the main purpose of a lawful contract and necessary to protect the covenantee in the enjoyment of the legitimate benefits of the contract."); *Trade Regulation in Michigan,* 23 Wayne L.Rev. at 278 ("The court in *Hubbard* discussed the classic example of a void, naked restraint. ... [T]he naked restraint rule remains firm."); *see also* Restatement, Second, Contracts § 187 ("A promise to refrain from competition that imposes a restraint that is not ancillary to an otherwise valid transaction or relationship is *unreasonably* in restraint of trade." (emphasis added)). And

an important consideration in making this ancillary/non-ancillary distinction is whether the non-compete agreement was executed in connection with the sale of goodwill. *See Hubbard,* 27 Mich. at 21–23; *Woodward,* 396 Mich. at 392, 240 N.W.2d 710 (Williams, J., dissenting) ("[T]here must be some form of restraint on the transferor of good will in order for the transferee to get the full value of what is being acquired."). It therefore follows that a relevant factor in assessing the reasonableness of a promise not to compete is whether goodwill was purchased from the promisor.

As mentioned, MARA eliminated the explicit statutory protection accorded to trade restraints relating to the sale of goodwill. But since MARA requires that the restraint be reasonable, and since under Michigan common law goodwill was pertinent to the reasonableness inquiry, the better view is that goodwill continues to be an appropriate consideration under MARA. *See Nation,* 454 Mich. at 494, 563 N.W.2d 233 (quoted *supra* p. 709); *B & B Inv. Group,* 229 Mich.App. at 7, 581 N.W.2d 17 (quoted *supra* p. 710); *cf. Cook v. Department of Soc. Servs.,* 225 Mich.App. 318, 324, 570 N.W.2d 684 (1997) (per curiam) ("Generally, the repeal of a statute revives the common law.").

The significance accorded to goodwill is easy to understand. Goodwill is, after all, "based upon the prospective profits to result from voluntarily continued patronage of the public." *Colton v. Duvall,* 254 Mich. 346, 349, 237 N.W. 48 (1931). *See also, e.g., Brown v. Weeks,* 195 Mich. 27, 39, 161 N.W. 945 (1917) ("Good will is often a valuable adjunct of a ... corporation where the company has long conducted its business, has a reputation for fair dealing, and has by its conduct attracted customers to it."). To the extent the vendor of goodwill competes with the vendee, he is in effect attempting to reacquire, at the vend-

ee's expense, the very asset which he previously conveyed. Indeed, there is authority for the view that in such a transaction the vendor is subject to an *implied* covenant not to compete. *See Colton,* 254 Mich. at 350, 237 N.W. 48; *Worgess Agency v. Lane,* 66 Mich.App. 538, 544–47, 239 N.W.2d 417 (1976). Thus when goodwill is purchased, freedom from competition can justifiably be viewed as a *legitimate* expectation on the vendee's part. *See Hubbard,* 27 Mich. at 19 (indicating that a promise not to compete could be valid if designed "for the protection of the *legitimate* interests of the party in whose favor it is imposed" (emphasis added)); *Boggs,* 115 Mich.App. at 739, 321 N.W.2d 794 ("[A] covenant not to compete ... could be lawful if ... necessary to protect the covenantee in the enjoyment of the *legitimate* benefits of the contract." (emphasis added)); *cf. Magee v. Brown,* 347 Mich. 638, 644, 81 N.W.2d 413 (1957) ("[A] seller is not allowed to derogate from his own sale.").

The Creditors do not quarrel with the proposition that goodwill is an important consideration in this context. They argue, however, that it is not an indispensable requirement. *See* Creditors' Brief at p. 20.

There are two flaws in this argument. First, none of the three cases cited by the Creditors clearly holds or states that a vendor's non-compete pledge need not be ancillary to the sale of goodwill to be upheld under Michigan law. In one of the cases, there was no sale of assets involved, and the court was called upon to apply not Michigan law, but the Sherman Act. *See United States v. Addyston Pipe & Steel Co.,* 85 F. 271, 272–73 (6th Cir.1898).

In each of the other two cases, only a portion of the vendor's business was sold. *See Magee,* 347 Mich. at 640, 81 N.W.2d 413; *Hubbard,* 27 Mich. at pp. 16–17. But it is unclear to

this Court, and the Creditors fail to explain, why such a sale could not include a corresponding part of the vendor's goodwill. Nor do the cases themselves offer any sound basis for inferring that the sale was exclusive of goodwill.

Indeed, *Hubbard* indicates to the contrary. As discussed earlier, the court in that case rejected the vendors' argument that the non-compete agreement was invalid because the consideration paid reflected only "the cost price of the goods" purchased. *Hubbard*, 27 Mich. at 18. But the court also rejected the premise underlying this argument:

> [T]here is no reason for holding that, without the restraint contracted for, [the] complainant would have been willing to purchase for the price he gave, nor can we say that the vendors could have sold at that price without such stipulation. In fact, we must infer that, in their opinion they could not have readily done so without it, or they would not have given it. It is clear, at all events, that they thought the sale with the stipulation was an advantageous one or they would not have made it. The contract must, therefore, be held fair, reasonable and valid. . . .

*Id.* at 21. Thus in the court's view, the vendors *did* receive a premium for the assets sold—i.e., an amount in excess of the actual market value of the assets. (By "market value," we mean simply the value of the asset without regard to intangibles such as the vendor's customer base, and without accounting for a commitment on the vendor's part not to compete.) More-

over, the court suggests that this premium could fairly be attributed to goodwill—if only for lack of a better term. *See id.* at 22–23 ("The sale to the complainant with the restriction contracted for was somewhat analagous [sic] to the sale of a goodwill, differing mainly in the fact that it was a sale of only a portion of the business, and did not include the building or business stand, which usually, if not always, accompanies the sale of a good-will, strictly so-called."). *Hubbard*, therefore, actually lends support for the view that a vendor's non-compete agreement must be associated with the sale of goodwill (or something like goodwill).

The other flaw in the Creditors' argument is even more fundamental. As indicated earlier, the deferential treatment generally accorded to goodwill-related covenants rests on the premise that the purchaser of goodwill has a legitimate right to expect that the vendor will not seek to undermine the value of the asset purchased. The Creditors implicitly assume that this same kind of expectation can arise even when goodwill is not among the assets sold. That assumption is arguably valid whenever the vendee pays more than market value. In such situations, the vendor's receipt of a premium—even if not chalked up to goodwill, as such—could perhaps still be seen as justifying the vendee's expectation that it will not have to compete with the vendor. This is particularly true if the premium reflects a valuation of the assets as a going concern—meaning that the vendee has in essence purchased a business.[4] *See, e.g., Colton*, 254 Mich. at

---

4. "[G]oing-concern value" is defined as "[t]he value of a commercial enterprise's assets or the enterprise itself as an active business with future earning power, as opposed to the liquidation value of the business or its assets." Black's Law Dictionary (7th ed.1999). In our discussion, we make the debatable assumption that one can purchase assets as a going concern without also purchasing goodwill. *Compare, e.g., Wayne County v. Britton Trust*, 454 Mich. 608, 613 n. 3, 563 N.W.2d 674 (1997) (suggesting that a company's "going concern value" and its "goodwill" are one and the same thing) *and* Black's Law Dictionary (7th ed. 1999) ("Going-concern value includes . . . goodwill.") *with id.* ("Good will

349, 237 N.W. 48 ("Though it is sometimes said contracts in restraint of trade are void as against public policy . . ., public policy requires when a man has created a *business* which he wants to sell he should have the right to sell it *in the most advantageous way* and to preclude himself from re-engaging in business directly competitive with that sold." (emphasis added)); *see also Beal v. Chase*, 31 Mich. 490, 528–29 (1875) (Christiancy, J.[5]) ("[P]ublic policy requires that when a man has by skill or by any other means obtained something which he wants to sell, *he should be at liberty to sell it in the most advantageous way* in the market; and in order to enable him to sell it sell it *advantageously* in the market, it is necessary that he should *be able to preclude himself from entering into competition with the purchaser*." (underscore added)); *cf.* Restatement, Second, Contracts § 188(2)(a) ("Promises imposing restraints that are ancillary to a valid transaction or relationship include . . . a promise by the seller of a *business* not to compete with the buyer in such a way as to injure the value of the business sold . . . ." (emphasis added)).

In this case, however, the Creditors do not claim that Spradlin or his dealerships received a premium for the assets sold. It is, therefore, unclear how they can be said to have disposed of their assets "in the most advantageous way." *Colton*, 254 Mich. at 349, 237 N.W. 48. Nor is it clear how freedom from Spradlin's competition can be characterized as one of the "legitimate benefits" of the Surrender and Settlement Agreement. *Boggs*, 115 Mich. App. at 739, 321 N.W.2d 794. The Credi-

tors make no attempt to address these related issues.

As noted earlier, separate consideration was paid for the NCA. One might therefore argue that the competition-free use of the assets purchased was indeed a legitimate benefit of the Surrender and Settlement Agreement.

■ The problem with this argument is that it ignores the requirement that the covenant not to compete subserve the asset acquisition. Indeed, under this reasoning there need not have been any such acquisition: The Steelcase Parties could simply have obtained a restraint from Spradlin which, so long as supported by consideration, would be ruled valid. That was certainly not the law in Michigan prior to the advent of MARA. *See supra* pp. 710–15. Nor is there anything in MARA to suggest that the legislature rejected the proposition that a non-compete agreement must be subordinate to another, "main purpose." *Boggs*, 115 Mich.App. at 739, 321 N.W.2d 794.

For these reasons, the Court concludes that the terms pursuant to which assets were sold under the Surrender and Settlement Agreement did not give rise to a legitimate expectation that the Steelcase Parties would be free from Spradlin's competition. This means that the covenant not to compete is in essence a naked restraint, rather than an ancillary one. As such, it is unreasonable and therefore unenforceable.

■ One last issue concerns a provision in the NCA whereby Spradlin and the

---

is to be distinguished from that element of value referred to . . . as going-concern value. . . . Although some courts have stated that the difference is merely technical . . ., it is generally held that going-concern value is that which inheres in a plant of an established business." (citation omitted)).

5. Justice Christiancy's opinion, which "was prepared . . . prior to his resignation," *Beal*, 31 Mich. at 494, is appended to the court's brief opinion. Then–Chief Justice Christiancy also authored the court's opinion in *Hubbard*, 27 Mich. 15 (1873).

dealerships "acknowledge and agree that the restrictive covenants assumed [by them] ... are reasonable." NCA at p. 1. During oral argument, counsel for the Creditors cited this provision and asserted that Spradlin is now estopped from challenging the NCA's validity.

■ "Generally speaking, estoppel cannot be used to enforce an illegal contract ... if the contract offends a public policy embodied in a statute." *William's Delight Corp. v. Harris,* 87 Mich.App. 202, 208, 273 N.W.2d 911 (1978). Although MARA § 2 does not explicitly so state, its prohibition of unreasonable trade restraints is clearly based on public policy. *See* Mich. Comp. Laws § 445.779 ("A person who engages in any violation of section 2 ... with the intent to accomplish a result prohibited by this act shall be guilty of a misdemeanor...."); Mich. Comp. Laws § 445.777 ("The attorney general ... may bring an action for appropriate injunctive or other equitable relief and civil penalties in the name of the state for a violation of ... [MARA]. The court may assess for benefit of the state a civil penalty of not more than $50,000.00 for each violation of ... [MARA]."); Mich. Comp. Laws § 445.783 (allowing for the grant of immunity for the benefit of a witness who "has or is likely to refuse to testify" in MARA-related proceedings if the "testimony or other information may be necessary to *the public interest* " (emphasis added)); *see also* Mich. Comp. Laws § 445.761 (repealed by MARA) ("All ... contracts by which any person ... promises ... not to engage in any avocation, employment, pursuit, trade, profession or business, whether reasonable or unreasonable, partial or general, limited or unlimited *are hereby declared to be against public policy* and illegal and void." (*quoted in Zencka,* 155 Mich.App. at 636, 400 N.W.2d 606; emphasis added)); *Hubbard,* 27 Mich. at 19–20 (The enforceability of a non-compete provision requires consideration of whether the provision is "specially injurious to the public."); *see also Addyston Pipe,* 85 F. at 279–80 (describing the various reasons underlying hostility toward trade restraints, most of which reflect concern for the public well-being).

The Creditors offered no rationale or authority for the proposition that an exception to *Harris's* "general rule" is appropriate in this case. Their cursory estoppel argument is therefore rejected.

Because the covenant not to compete contained in the NCA is unenforceable, the Creditors' claim is subject to disallowance pursuant to 11 U.S.C. § 502(b)(1) insofar as it is based on breach of that covenant. Accordingly, Spradlin's motion will be granted and the Creditors' motion denied with respect to this issue.

### Summary

The Creditors failed to demonstrate that they are entitled to summary judgment on the issue of damages. The Court agrees with Spradlin that the Steelcase Parties lack standing to seek damages based on breach of the covenant not to compete. The Court also agrees with Spradlin that the covenant is not enforceable under Michigan law.

An appropriate order has entered.